ESTATE OF Patroky POLUSHKIN by David POLUSHKIN, Personal Representative of the Estate, Appellant,

v.

Roland MAW, Appellee.

No. S–11775.

Supreme Court of Alaska.

Oct. 26, 2007.

Michael Hough, Homer, for Appellant.

Peter R. Ehrhardt, Kenai, for Appellee.

Before: BRYNER, Chief Justice,
MATTHEWS, EASTAUGH, FABE, and
CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

In October 1989 Patroky Polushkin purchased an Upper Cook Inlet salmon drift fishery permit from Roland Maw. An addendum to the purchase agreement provided that Maw would retain all rights to claims or benefits resulting from the March 1989 EXXON VALDEZ oil spill that were associated with the permit. The question presented in this case is whether Maw is entitled to damages resulting from the oil spill that Polushkin suffered after the transfer of the permit. We answer in the negative because the language of the addendum is ambiguous, extrinsic circumstances suggest that the clause was intended to ensure that Maw's right to damages was not transferred with the permit, and reading the addendum to be an assignment of Polushkin's future claims to Maw would lead to unreasonable results. Because there is no relevant conflicting extrinsic evidence, we conclude that summary judgment should be entered in favor of Polushkin's estate.

## II. FACTS AND PROCEEDINGS

### A. Facts

In the fall of 1989 commercial fisherman Roland Maw listed his Upper Cook Inlet salmon drift fishery permit for sale. Patroky Polushkin offered to buy it. With the help of their brokers (Bruce Martinson[1] of the Seattle brokerage firm GSI for Maw and Roseleen Moore of the Homer firm Northern Enterprises Boat and Permit Brokerage for Polushkin), the parties agreed on Maw's asking price of $186,000 and executed an earnest money agreement in October 1989. Maw testified that there had been no "haggling"

over the sales price. According to Moore, the price was a bit high but was within about $10,000 of the going market price for Upper Cook Inlet salmon drift net permits at that time.

At the same time that they signed the earnest money agreement, Maw and Polushkin, as well as their brokers, signed an addendum to the agreement. The text of the addendum follows:

By their signatures below, the buyer and seller agree to modify their agreement regarding the sale of Alaska Cook Inlet Salmon Drift Gillnet Entry Permit number S03H61467Z as follows:

Seller shall retain all rights of ownership and effect associated with the above referenced Alaska Entry Permit, to claims, settlements, and/or benefits resulting from the March 1989 Exxon oil spill, against the vessel Exxon Valdez, and the 1987 Glacier Bay oil spill.

Maw testified that he directed his broker, Martinson, to draft the addendum.[2] According to Maw, one of the GSI brokers characterized the addendum as "boiler plate." Maw also stated that "Polushkin himself suggested that the parties and the brokers all sign the addendum in order to avoid issues and misunderstandings about it in the future."

Polushkin fished the permit in 1990, 1991, and 1992. He died in October 1992. The permit was then transferred to another person, who is not a party to this case. David Polushkin, Patroky's son, serves as the personal representative of Patroky's estate.

The 1987 GLACIER BAY oil spill referred to in the addendum involved the spill of oil from the vessel GLACIER BAY into Cook Inlet.[3] The record does not indicate that claims were made that this oil spill caused damage after October 1989. The EXXON VALDEZ oil spill occurred in March 1989 in Prince William Sound. Some of the oil drifted into Cook Inlet and caused state fisheries regu-

---

1. Neither party has been able to locate Martinson.

2. A handwritten "client activity log" apparently kept by Maw's broker, GSI, includes the following entry by "DF" for October 11, 1989: "Draft-

ed Addendum Re: Exxon Benny's. Faxed to Roland Maw."

3. *See In re The Glacier Bay,* 71 F.3d 1447, 1449 (9th Cir.1995).

lators to cancel the drift gillnet salmon fishery in the inlet for 1989. Both the GLACIER BAY spill and the EXXON VALDEZ spill resulted in class-action litigation in which holders of Cook Inlet drift permits were class members.[4] In 1991 and 1992 Maw received three separate payments, totaling $54,945.57, for damages for the GLACIER BAY oil spill. These funds were to compensate Maw for the reduction to his 1987 fishing income caused by the spill, and Maw was obliged to pay from these funds the percentage he owed to crew members who were percentage shareholders in his 1987 fishing income. Polushkin did not claim any interest in these funds.

The EXXON VALDEZ spill was much larger than the GLACIER BAY spill and the litigation it engendered was more complex.[5] A multibillion dollar punitive damages award to class members only now may be nearing a final resolution.[6] In 1997 a plan of distribution of present and future recoveries in the EXXON VALDEZ litigation in favor of Upper Cook Inlet salmon drift net claimants was approved by the United States District Court for the District of Alaska.[7] This plan explains the types of claims held by Upper Cook Inlet fishermen.

The largest claims are for seasonal lost income. The season with the greatest loss is the 1989 season, and the greatest allocation of the anticipated proceeds is made for that year. Smaller allocations are made for seasonal funds for 1990, 1991, 1994, and 1995. Concerning the 1990 and 1991 seasonal funds, the plan of distribution notes that the price of salmon "was negatively impacted as a result of the spill ... resulting in lost income to UCI salmon drift claimants." According to the plan, the 1994 and 1995 seasonal funds were created not because the price of salmon in those seasons had been reduced but because of poor predicted returns for those seasons said to be the result of "overescapement into the Kenai River system" resulting "in long-term damage to the salmon stocks from that system."

The plan also provides a method of compensating permit holders for the devaluation of permits sold between the second quarter of 1989 and the fourth quarter of 1992. According to the plan, disbursements will be proportioned to the amount by which actual market values of permits fall short of what they would have been without the spill. The shortfall is based on economic studies and is set forth in tabular form in the plan.[8] According to the plan, the predicted value in the fourth quarter of 1989 for an Upper Cook Inlet permit was $192,381 and the actual value was $180,500. Without the oil spill,

4.  *Id.*

5.  *See In re The Exxon Valdez,* 472 F.3d 600 (9th Cir.2006).

6.  *See In re Exxon Valdez,* 490 F.3d 1066 (9th Cir.2007) (denial of rehearing en banc). Exxon

has filed a petition of writ of certiorari to the United States Supreme Court.

7.  *In re Exxon Valdez,* No. A89–095–CV (D.Alaska Apr. 22, 1997).

8.  The table provides in relevant part as follows:

| Year Qtr | Predicted Value | Actual Value | Predicted-Actual Gap | Seller's Share | Buyer's Share |
|---|---|---|---|---|---|
| 1989.2 | $184,764 | $173,353 | ($ 11,411) | 7.55% | 92.45% |
| 1989.3 | $188,573 | $176,927 | ($ 11,646) | 7.71% | 92.29% |
| 1989.4 | $192,381 | $180,500 | ($ 11,881) | 7.86% | 92.14% |
| 1990.1 | $210,597 | $197,591 | ($ 13,006) | 8.61% | 91.39% |
| . . . | | | | | |
| 1992.1 | $183,651 | $ 90,091 | ($ 93,560) | 61.91% | 38.09% |
| 1992.2 | $202,306 | $ 89,207 | ($113,099) | 74.84% | 25.16% |
| 1992.3 | $218,340 | $ 86,229 | ($132,111) | 87.42% | 12.58% |
| 1992.4 | $234,373 | $ 83,250 | ($151,123) | 100% | 0% |

according to the table, the value in the fourth quarter of 1992 should have been $234,373, but the actual value was $83,250. Thus, a hypothetical seller who sold in the fourth quarter of 1989 suffered a projected loss of $11,881, whereas the buyer of the same permit at that time would have suffered an actual loss as of the fourth quarter of 1992 of $97,250 ($180,500 less $83,250) and a projected loss of $151,123.

A third fund is created to compensate for the spill-caused decline in market value of fishing vessels used in the fishery. Distributions from this fund are said to be based "on market values rather than individual vessel values" because "[a]ccounting for variations in individual vessel values would be unreasonably, if not prohibitively, expensive and time-consuming." Every owner of a vessel used in the fishery between March 24, 1989, and December 31, 1992, is eligible. Fund proceeds are to be distributed to vessel owners in a manner proportional to the amount by which vessels are estimated to have declined in value "from March 24, 1989 through December 31, 1992, using loss in permit values as a measure."

In December 1992 an attorney from Faegre & Benson, a law firm in Minneapolis representing both the class in the EXXON VALDEZ litigation and Maw, wrote to David Polushkin seeking confirmation that he had no objection to "Maw's obtaining your father's 1990 and 1991 fishing records from the Commercial [Fisheries Entry] Commission for Mr. Maw's use in pursuing his claim against Exxon." The attorney stated: "As you are probably aware, Mr. Maw retained rights to recover all damages accruing under the permit at the time he sold it to your father." According to Maw's affidavit filed in connection with the summary judgment motion in this case, the requested records were provided by the estate without comment. But Maw contradicted this affidavit in his deposition, stating he had no knowledge of what David Polushkin did in response to the letter; all he knew was that his claims were submitted.

In December 1994 David Polushkin was given a payment of $2,337.56 by a Kenai law firm disbursing funds from a partial settlement with the Alyeska Pipeline Service Company, a co-defendant in the Exxon case. This payment was for his father's lost fishing income in the 1990 and 1991 fishing seasons and was based on his father's catch history on the permit in question. Maw received two payments from Faegre & Benson funded by the same partial settlement: the first was in January 1994, and the second was in July 1995, totaling $7,558.64. According to the letter transmitting the January 1994 payment the breakdown for the initial payment to Maw was as follows:

| | |
|---|---|
| Net Allocation for 1989: | $3869.22 |
| Net Allocation for 1990: | $1293.68 |
| Net Allocation for 1991: | $1118.41 |
| Net Allocation for permit devaluation: | $ 813.27 |

In late 2002 a Seattle law firm, Davis Wright Tremaine, administering the Exxon Qualified Settlement Fund, sent two letters to the estate's attorney. In the first letter the Davis Wright firm asserted that the plain language of the addendum granted all claims to Maw, "whether such claims arose before or after the sale of the permit." The second letter, dated December 4, 2002, acknowledged that the estate's counsel disputed the Davis Wright interpretation. It warned that unless the estate presented a release of claims signed by Maw by February 15, 2003, Davis Wright would "honor Mr. Maw's lien against the estate's claims on behalf of Mr. Polushkin." [9]

## B. Proceedings

On March 13, 2003, David Polushkin, as the personal representative of the Estate of Patroky Polushkin, filed a complaint against Maw. The complaint sought a declaratory judgment that Polushkin and derivative claimants (such as crew members) are entitled to the Exxon litigation claims that arose after Polushkin acquired the permit in October 1989.

After answering the complaint, Maw moved for summary judgment. Polushkin opposed the motion and cross-moved.

9. Copies of these letters were sent to Maw in      care of Faegre & Benson.

While the motions for summary judgment were pending, Maw removed the case to the United States District Court for the District of Alaska. Both the estate and Maw renewed their motions for summary judgment in the district court, but the court remanded the case to state court without deciding the motions. Once back in state court the parties again renewed their motions.

Superior Court Judge Harold M. Brown granted summary judgment in Maw's favor, without comment, ordering that Maw

> shall retain all rights of ownership to all claims, payments and settlements from the 1989 Exxon Oil Spill relating to Permit # S03H61467Z, whether such claims arose before or after the sale of the permit to Patroky Polushkin. Mr. Maw is entitled to all claims, payments and settlement funds from that case relating to this permit.

The superior court also denied Polushkin's cross-motion for summary judgment. Polushkin appeals.

## III. STANDARD OF REVIEW

■■■ "We review the grant or denial of summary judgment *de novo* to determine whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law on the established facts." [10] "We draw all reasonable inferences of fact against the moving party and in favor of the non-moving party." [11] Questions of contract interpretation are generally questions of law which will be reviewed de novo. [12] However, fact questions are created when the meaning of contract language depends on conflicting extrinsic evidence. [13] The question of the meaning of a written contract, including a review of the extrinsic evidence to determine whether any of the extrinsic evidence is conflicting, is a legal question which we review de novo. [14]

## IV. DISCUSSION

### A. The Addendum Is Ambiguous.

■■■ When interpreting a contract, our duty is to "ascertain and give effect to the reasonable intentions of the contracting parties." [15] We determine the parties' reasonable intentions by "resort[ing] to the language of the disputed provision and other provisions, relevant extrinsic evidence, and case law interpreting similar provisions." [16] It is not necessary to find that an agreement is ambiguous before looking to extrinsic evidence as an aid in determining what it means. [17]

Both parties presented extrinsic evidence to aid in interpreting the addendum. We have held that

> [i]nterpreting a written contract is generally a task for the trial court; however, interpretation becomes a task for the trier of fact when the parties present extrinsic evidence to clarify a contract's meaning, when this evidence points toward conflicting interpretations of the contract, and when the contract itself is reasonably susceptible of either meaning. In such cases, the trial court initially determines whether the extrinsic evidence meets the criteria to create a jury question; when the court finds that the extrinsic evidence does not conflict or is incompatible with the terms of the written contract, interpretation remains a question of law for the court's determination. [18]

10. *Zok v. Collins*, 18 P.3d 39, 41 (Alaska 2001).

11. *Id.*

12. *Burns v. Burns*, 157 P.3d 1037, 1039 (Alaska 2007).

13. *Norville v. Carr–Gottstein Foods Co.*, 84 P.3d 996, 1000 n. 1 (Alaska 2004).

14. *Still v. Cunningham*, 94 P.3d 1104, 1109 (Alaska 2004); *Little Susitna Constr. Co. v. Soil Processing, Inc.*, 944 P.2d 20, 23 (Alaska 1997).

15. *W. Pioneer, Inc. v. Harbor Enters., Inc.*, 818 P.2d 654, 656 (Alaska 1991).

16. *Id.*

17. *Alyeska Pipeline Serv. Co. v. O'Kelley*, 645 P.2d 767, 771 n. 1 (Alaska 1982) ("[A] court in this jurisdiction may initially turn to extrinsic evidence in construing a contract."); *Peterson v. Wirum*, 625 P.2d 866, 871 (Alaska 1981).

18. *Little Susitna*, 944 P.2d at 23 (citing *Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch. Dist.*, 778 P.2d 581, 584 (Alaska 1989); *Alaska N. Dev., Inc. v. Alyeska Pipeline Serv. Co.*, 666 P.2d 33, 39 (Alaska 1983); Restatement (Second) of Contracts § 212(2) (1981)).

The 1989 addendum states that Maw will "retain all rights of ownership and effect associated with the ... Permit, to claims, settlements, and/or benefits resulting from the March 1989 Exxon oil spill, against the vessel Exxon Valdez, and the 1987 Glacier Bay oil spill." The estate argues that this language was designed to ensure that the transfer of the permit did not carry with it the claims for losses that Maw had suffered as a result of the oil spills. Maw, on the other hand, contends that the language was meant to assign to him future damages that Polushkin might suffer as a result of the spills.

The language of the addendum conceivably could support the interpretation of either party. On the one hand, the verb "retain" suggests that only claims that Maw had at the time of transfer were the subject of the transaction. He could hardly "retain" claims for damages that Polushkin might suffer in the future though Polushkin might assign those claims to him. On the other hand, the "all rights" language with no explicit time cut-off could suggest that an assignment of future claims was intended. The language of the addendum is therefore ambiguous. Rules in aid of contract interpretation must be employed in an effort to determine its meaning.

### B. Relevant Extrinsic Circumstances Indicate That No Assignment of Future Claims Was Intended.

The rules in aid of contract interpretation are set out in section 202 of the Restatement (Second) of Contracts. The first and generally most important rule is that "[w]ords and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." [19]

#### 1. Maw's account of his subjective intent is not probative.

■ In support of his motion for summary judgment Maw filed an affidavit explaining his view of the purpose of the addendum. The affidavit states in relevant part:

At the time of entering into and signing the agreement and addendum it was the intent of Mr. Polushkin and I and we understood and agreed that Polushkin had no interest in *my* Exxon or Glacier Bay claims and that I was to receive all proceeds or money from *those* claims.

(Emphasis added.)

Polushkin's counsel argues that the emphasized language indicates that the addendum was only intended to apply to existing claims. He argues:

Mr. Polushkin, if he were alive, would hardly state it better: "Mr. Polushkin had no interest in my (Mr. Maw's) Exxon or Glacier Bay claims and that I (Mr. Maw) was to receive all proceeds or money from those claims." The operative words are "my claims", and "those claims", referencing "my claims".

Although this argument has some plausibility, we do not view Maw's affidavit as an admission that the addendum was only intended to cover claims suffered by Maw. Given Maw's theory that he reserved all claims for past and future losses, his use of the term "my claims" could simply be a reference to the full scope of what he contends he contracted for.

In a later affidavit, made after Polushkin made the argument noted above, Maw offered a modified account regarding the intent of the parties:

At the time of entering into and signing the agreement and addendum it was the intent of Mr. Polushkin and I that Polushkin had no interest in any claim, settlement or benefit resulting from the March 1989 Exxon oil spill against the vessel Exxon Valdez and the 1987 Glacier Bay oil spill and that I retained all rights to those claims. It was understood and agreed between Mr. Polushkin and myself that those were my claims not his and I was to receive all future proceeds or money from those claims.

Further, in subsequent deposition testimony Maw interpreted the agreement using these words: "I kept those rights, that was a part of the agreement from day one. Nobody

---

**19.** Restatement (Second) of Contracts § 202(1)    (1981).

knew where this thing was going to go, but wherever it went, those were mine." [20]

■ None of these post-litigation statements are probative extrinsic evidence. Statements as to the subjective intent of parties to a contract made during litigation do not create issues of fact regarding the meaning of the contract. As we stated in *Still v. Cunningham:* "[W]e are ... justified in disregarding parties' statements made during litigation as to their subjective impressions or intent at the time of a transaction 'unless the party in some way expressed or manifested his understanding at the time of contract formation.'" [21] In a footnote to this statement we set forth the following language from the seminal case of *Peterson v. Wirum:*

> Differences of opinion among the parties as to their subjective intent, expressed during the litigation, do not establish an issue of fact regarding the parties' reasonable expectations at the time they entered into the contract, since such self-serving statements are not considered to be probative. Rather, the court must look to the express manifestations of each party's understanding of the contract in attempting to give effect to the intent behind the agreement.[22]

Maw's testimony as to what was understood or intended at the time of the transaction does not relate what was stated or written [23] between the parties at the time of contract formation. It is thus not probative extrinsic evidence as to the meaning of the addendum.

### 2. Extrinsic evidence indicates that a normal allocation of claims was intended.

■ Maw's testimony as to what was said during the transaction is entitled to weight. Maw stated that he was told by his broker that the addendum language was merely "boiler plate." This means that the adden-

dum was thought to be a part of a normal, as distinct from an unusual, allocation of claims between a buyer and seller of a permit.

Polushkin's broker in the transaction, Roseleen Moore, testified by affidavit that while she did not recall this specific transaction, she would have read the addendum to mean that Maw would keep the damages that he suffered as a result of the spills and that Polushkin would have any damages he might suffer in the future. Moore also testified that such an allocation would be normal for the industry. She testified that she participated in perhaps 100 or more similar transactions involving Cook Inlet drift permits and has never been involved in any permit sale in which the seller kept the right to future damages caused by the EXXON VALDEZ or GLACIER BAY spill. Moore made it clear that the reason for claims retention clauses was so that sellers would not be thought to have transferred their rights to damages they suffered to permit buyers:

> When the Exxon spill happened, as well as to a lesser degree when the Glacier Bay oil spill occurred in 1987, sellers of permits were concerned about making sure they kept whatever rights they had regarding the damages they suffered as a result of the spills. The sellers wanted to be sure their rights to damages did not pass with the permit.

Moore also detailed some reasons why it would be atypical for a seller to retain damages accruing after a permit is sold. She stated:

> I believe it would be very unusual that a seller would retain future damages after the permit was transferred because those damages would be based on the participation and catch history of the purchaser. The future losses and damages, primarily lost income, would be based on catch and

---

**20.** Maw gave this answer in connection with the meaning of the terms of the plan of distribution for Upper Cook Inlet drift gillnet permit holders. Maw, who was at one time the executive director of the Upper Cook Inlet Drift Fishermen's Association, participated in the development of the standards of the plan.

**21.** 94 P.3d 1104, 1110 (Alaska 2004) (quoting *Norville v. Carr–Gottstein Foods Co.,* 84 P.3d 996, 1003 (Alaska 2004)).

**22.** *Id.* at 1110 n. 14 (quoting *Peterson v. Wirum,* 625 P.2d 866, 870 (Alaska 1981)).

**23.** The negotiations were conducted without face-to-face meetings.

price and consider the size of the crew the purchaser used, his or her expenses, use of a spotter pilot, the markets available to the purchaser, whether the permit holder was experienced in the fishery, whether the vessel used was ideal for the specific fishery and other variables all focused on the abilities and participation of the purchaser.

Moore's testimony as to the normal allocation of claims in permit transfer transactions is not refuted. Maw, at his deposition, could not think of any other permit transfer transaction in which a seller claimed to be retaining future damage suffered by a buyer.[24] Maw did not attempt to refute Moore's account as to the normal allocation of claims between sellers and buyers of Cook Inlet permits.

There is therefore uncontested evidence suggesting that both Maw's broker and Polushkin's broker regarded the allocation of claims that the addendum addressed to be normal for transfers of Cook Inlet permits. The evidence is also uncontested that the normal allocation for such permits is that claims accrued as of the time of transfer are retained by the seller whereas losses that might be suffered in the future belong to the buyer.

### 3. Extrinsic evidence indicates that the price for the permit was not discounted.

Another undisputed item of extrinsic evidence relates to the price of the permit. The price of the permit was slightly above the average. Moore testified that the price Polushkin paid to Maw, $186,000, was, in her view, a slight premium price and that it was not discounted. Maw testified at his deposition that he did not know of any sales at the time of this particular sale where a permit had been sold for a higher price. If the transaction were intended to entail an assignment of Polushkin's future claims to Maw, one would expect that the sales price would be discounted. Permits are fungible, there is an active market in them, and there is no reason why Polushkin would have assigned his claims to Maw without receiving compensation in the form of a reduced sale price. Yet it is clear that there was no such compensation as Polushkin paid a market price for the permit rather than a discounted price. This, in turn, suggests that no assignment was intended.[25]

### 4. There is no probative course of performance evidence.

Maw claims that there is extrinsic evidence concerning the parties' course of performing the contract that indicates that post-transfer claims for losses suffered by Polushkin were meant to be assigned to Maw. Extrinsic evidence of a course of performance can be an aid in interpreting the meaning of a contract. Subsection 202(4) of the Restatement (Second) of Contracts states concerning course of performance: "Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and oppor-

---

**24.** The record does reveal one other case where such a claim was made. This case, which was brought to Maw's attention during his deposition, and with which Moore was also familiar, resulted in litigation and a consent judgment in which the claims were allocated between buyer and seller as of the time of transfer (except for the vessel devaluation claim where the dividing line was the calendar year of transfer).

**25.** The plan of distribution recognizes the logical relationship between an assignment of future claims and a discounted sale price. Thus the plan states as follows:

In some cases, permit buyers and sellers agreed to assign litigation rights *and this was taken into consideration in arriving at the permit sale price.* Plaintiffs' counsel would abide by such agreements which are reflected in written contracts, (*e.g.,* contracts which con-

tain language such as "It is hereby agreed that all right, title and interest in all claims for damages arising out of the Exxon oil spill incurred by the seller prior to and including the closing date of the sale of the permit, shall remain with the seller" or "Both parties agree that the sale and transfer shall not convey to the buyer any right, title or interest of the seller in any claim arising as a result of the Exxon Valdez oil spill on or about March 24, 1989 which claims arose prior to the sale and transfer") to the extent not disputed by the parties. To the extent the intent of such contracts are disputed by the parties, plaintiffs' counsel would hold back any affected distributions until the parties' disagreement is resolved.
(Emphasis added.)

tunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." Comment g explains that the rationale for the use of course of performance evidence is that "[t]he parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning." But the comment goes on to state that action on a single occasion or the action of one party only is not entitled to weight:

> The rule of Subsection (4) does not apply to action on a single occasion or to action of one party only; in such cases the conduct of a party may be evidence against him that he had knowledge or reason to know of the other party's meaning, but self-serving conduct is not entitled to weight.

The Uniform Commercial Code—Sales adopted in Alaska also requires repeated occasions for course of performance evidence.[26] The reporter's comment with respect to course of performance states that "[a] single occasion of conduct does not" amount to a course of performance.[27] The Uniform Commercial Code—Sales governs the sale of "goods," a broad term that nonetheless does not encompass limited entry permits.[28] But this does not mean that the UCC is irrelevant. This court has previously relied on the UCC to resolve contract disputes not strictly governed by the act.[29] Other courts have done the same. "[T]he UCC is regarded as a modern restatement of the law of contracts that has the seal of legislative approval. Consequently, there is a very strong tendency to apply the UCC to non-UCC contracts either directly or by way of analogy." [30]

In light of these considerations we believe that it is appropriate to be guided by the provisions of the UCC—Sales statute and the consistent principles of the Restatement (Second) of Contracts § 202 in considering whether there is relevant course of performance or practical construction evidence in this case.

▪▪▪ As course of performance evidence Maw claims that David Polushkin, on behalf of the estate, provided Maw's counsel with Patroky Polushkin's fishing records for 1990 and 1991.[31] This is not course of per-

**26.** AS 45.02.208 provides:
> **Course of performance or practical construction.**
> (a) If the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, a course of performance accepted or acquiesced in without objection is relevant to determine the meaning of the agreement.
> (b) The express terms of the agreement and the course of performance, as well as the course of dealing and usage of trade, shall be construed when reasonable as consistent with each other; but if the construction is unreasonable, express terms control the course of performance and the course of performance controls both the course of dealing and usage of trade (AS 45.01.205).
> (c) Subject to the provisions of AS 45.02.209 on modification and waiver, the course of performance is relevant to show a waiver or modification of terms inconsistent with the course of performance.

**27.** Uniform Commercial Code (UCC) § 2–208 cmt. 4.

**28.** AS 45.02.102; AS 45.02.105(a) (defining "goods" as "all things ... movable at the time of identification to the contract for sale other than ... investment securities, and things in action").

As one commentator states, the "[Sales] Article does not apply to licenses, whether that term is used in the property sense or as representing a governmental grant." 2 Larry Lawrence, Lawrence's Anderson on the Uniform Commercial Code § 2–105:74 (3d ed. rev.2004).

**29.** See Cousineau v. Walker, 613 P.2d 608, 615–16 (Alaska 1980) (analogizing to the UCC's treatment of caveat emptor in a real property contract dispute); Fireman's Fund Ins. Co. v. Sand Lake Lounge, Inc., 514 P.2d 223, 226–27 (Alaska 1973) (analogizing to UCC statute of limitations provisions in an insurance contract dispute over the interpretation of a limitations clause); Rego v. Decker, 482 P.2d 834, 838 (Alaska 1971) (drawing from the UCC's provision that a contract will not fail for indefiniteness if there is a reasonably certain basis for providing a remedy in a contract dispute involving an option contract for the sale of land); see also Veach v. Meyeres Real Estate, Inc., 599 P.2d 746, 749 n. 5 (Alaska 1979) (citing the UCC by analogy).

**30.** 1 Larry Lawrence, Lawrence's Anderson on the Uniform Commercial Code § 1–101:42 (3d ed. rev. 2003).

**31.** On this record, whether this actually occurred is in doubt, given Maw's subsequently declared lack of knowledge. But for the purpose of the

formance evidence for two reasons. First, David Polushkin was not a party to the contract and thus did not know what the parties meant when they made the agreement. His performance, therefore, would not be evidence of Patroky Polushkin's understanding of the meaning of the addendum.[32] Second, David Polushkin's action occurred on only a single occasion. Course of performance evidence to be relevant requires repeated occasions.[33]

■ Maw also claims that his receipt of the GLACIER BAY oil spill proceeds is relevant course of performance evidence. This argument lacks merit because all the GLACIER BAY proceeds were for losses incurred prior to the transfer.

■ Finally, Maw claims that his receipt of Alyeska settlement proceeds for the years 1990 and 1991 is relevant course of performance evidence. This argument also lacks merit. This is self-serving conduct of one party only. As such, as the commentary to the Restatement makes clear, it is not entitled to weight.

### C. Interpreting the Addendum To Be an Assignment of Polushkin's Future Losses Would Be Unreasonable.

■ One important guide to the meaning of a contract is that interpretations that give a reasonable meaning to a contract are preferred to those that impart an unreasonable meaning. As section 203(a) of the Restatement (Second) of Contracts provides: "[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." The commentary to this section further explains this rule: "In the absence of contrary indication, it is assumed that each term of an agreement has a reasonable rather than an unreasonable meaning, and that the agreement is intended to be lawful rather than unconscionable, fraudulent or otherwise illegal."[34]

Interpreting the addendum to be an assignment of Polushkin's future claims to Maw would have unreasonable, arguably unconscionable, consequences. Focusing only on the decline in value of the permit, Maw's projected loss was $11,881.[35] His actual loss was only about half that because he sold the permit to Polushkin for a slight premium. By contrast, Polushkin's actual loss between the time of his purchase and the time of his death was $102,750, and his projected loss was $151,123.[36] To construe the addendum to assign losses of this magnitude to Maw would be unreasonable, given that Maw paid nothing for an assignment and will be fully

present opinion we assume that David Polushkin provided the records. *See supra* Part II.A. In support of his argument, Maw cites *Exxon Corp. v. State*, 40 P.3d 786, 795–96 (Alaska 2001). In *Exxon* this court considered course of performance evidence in interpreting whether an agreement between Exxon and the state granted to the state the discretion to deny an enlargement of an oil-producing unit area. In affirming the state's discretionary authority we relied on course of performance evidence by Exxon acknowledging such authority on three occasions. *Id.*

32. "[C]ourse of performance when employed to interpret a contract is an indicator of what the parties intended *at the time they formed their agreement.* It is an expression by the parties of the meaning that they gave to the terms of the contract that they made." ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 24.16, at 136 (rev. ed.1998) (emphasis added).

33. Although evidence of conduct on a single occasion does not amount to a course of performance, action on a single occasion by a party, as comment g to section 202 of the Restatement notes, "may be evidence against him that he had knowledge or reason to know of the other party's meaning...." Such evidence can be important because where parties have attached different meanings to an agreement "it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made" the other party either knew or had reason to know of the meaning attached by the first party. RESTATEMENT (SECOND) OF CONTRACTS § 201(2)(a) & (b) (1979). But this use of conduct evidence could not be applied to David Polushkin because he was not party to the contract and thus lacked both knowledge and reason to know of the meaning attached by Maw to the contract at the time it was made.

34. RESTATEMENT (SECOND) OF CONTRACTS § 203 cmt. c.

35. *See supra* Part II.A.

36. *See supra* Part II.A.

compensated for the losses that he suffered. The same is also true with respect to Maw's claim for the loss in value to Polushkin's fishing boat. Polushkin did not buy his boat from Maw, yet Maw claims that he acquired the right to claim damages for its spill-related depreciation. Again, and for the same reasons as those previously expressed with respect to the decline in value of the permit, such a claim is unreasonable. Maw's claim to loss of income suffered by Polushkin on account of Polushkin's fishing endeavors in 1991 is also unreasonable for the same reasons.[37]

## V. CONCLUSION

Although the words used in the addendum to the purchase agreement arguably could support the interpretation offered by either party, the relevant extrinsic evidence and the rule that contracts should be interpreted to have a reasonable meaning in the absence of a contrary indication demonstrate that the addendum was not meant to assign losses suffered by Polushkin to Maw. Since there are no genuine issues of material fact, the Estate of Patroky Polushkin is entitled to summary judgment on this issue. Accordingly, the judgment of the superior court is REVERSED, and this case is REMANDED for further proceedings in accordance with this opinion.

---

37. Further, one would expect that if the contract actually contemplated that Maw would receive damages for Polushkin's future loss of fishing income, provisions requiring diligence and reporting would have been built into the contract.