*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CREEKSIDE LIMITED PARTNERSHIP; CREEKSIDE-ALYESKA, LLC; and COMMUNITY DEVELOPMENT, INC., | ) ) ) | Supreme Court No. S-17517 |
| | ) | Superior Court No. 3AN-18-06143 CI |
| Appellants, | ) ) | O P I N I O N |
| v. | ) ) | No. 7509 – March 12, 2021 |
| ALASKA HOUSING FINANCE CORPORATION, | ) ) ) | |
| Appellee. | ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Thomas A. Matthews, Judge.

Appearances: Taylor B. McMahon, Law Offices of Royce & Brain, Anchorage, for Appellants. Cynthia L. Cartledge and Megan N. Sandone, Jermain, Dunnagan & Owens, Anchorage, and Stefan A. Saldanha, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices. [Borghesan, Justice, not participating.]

WINFREE, Justice.

## I. INTRODUCTION

A project developer that had used state-allocated federal tax credits for a low-income housing project sued the state housing authority, asserting an option to

eliminate a contractual obligation to maintain the project as low-income housing for 15 years beyond the initial 15-year qualifying period. The superior court granted summary judgment in favor of the housing authority, and the developer appeals several aspects of the court's ruling. We conclude that the court correctly interpreted the relevant statutes and contract documents and correctly determined there were no material disputed facts about the formation of the parties' agreements. We therefore affirm the court's grant of summary judgment in the housing authority's favor.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

#### 1.     The low-income housing tax credit program

The federal government created a low-income housing tax credit (LIHTC) program as part of the Tax Reform Act of 1986.[1] The program incentivizes development and rehabilitation of affordable rental housing by providing tax credits to developers of qualified low-income housing projects.[2]

Tax credit allocation involves both the federal and state governments.[3] The federal government allocates LIHTCs to states based on population.[4] State housing agencies then are responsible for allocating tax credits to low-income rental housing

---

[1]     Tax Reform Act of 1986, Pub. L. No. 99-514, § 252, 100 Stat. 2085, 2189-2208 (codified as amended at I.R.C. § 42).

[2]     MARK P. KEIGHTLEY, CONG. RESEARCH SERV., RS22389, AN INTRODUCTION TO THE LOW-INCOME HOUSING TAX CREDIT 1 (2019).

[3]     *Id.* at 2.

[4]     *Id.*

developers under their state's qualified allocation plan,[5] which must meet certain requirements.[6] For example, all allocation plans must prioritize projects serving the lowest-income tenants and remaining affordable for the longest periods.[7]

The Internal Revenue Code establishes rules about the length of time a project must maintain affordability requirements to receive tax credits.[8] The Code provides that developers must make "an extended low-income housing commitment" to receive credits, requiring the project to maintain affordability for an "extended use period."[9] The extended use period lasts 15 years beyond the initial 15-year compliance period, for a total of 30 years, unless otherwise specified by the state agency's agreement.[10]

The Code provides two possibilities for ending the affordability restrictions prior to the extended use period's end.[11] First, the extended use period may end prematurely if the project is acquired from the developer by foreclosure (or instrument

---

[5]     *Id.*; *see* I.R.C. § 42(m)(1)(B) (defining qualified allocation plan).

[6]     *See* I.R.C. § 42(m)(1)(C) (setting out required selection criteria).

[7]     I.R.C. § 42(m)(1)(B)(ii)(I)-(II); KEIGHTLEY, *supra* note 2, at 2.

[8]     I.R.C. § 42(h)(6).

[9]     *Id.*

[10]     *See* I.R.C. § 42(i)(1) (stating "compliance period" is "the period of 15 taxable years beginning with the [first] taxable year of the credit period with respect thereto"); I.R.C. § 42(h)(6)(D) (defining "extended use period" as period that "begin[s] on the [first] day in the compliance period on which [the] building is part of a qualified low-income housing project" and ends on "the date which is 15 years after the close of the compliance period" or "the date specified by [the] agency in [the] agreement," whichever is later).

[11]     I.R.C. § 42(h)(6)(E).

in lieu of foreclosure).[12]  Second, the extended use period may end prematurely under what is known as the "qualified contract" option.[13]  Under this option a developer may remove the project from the program if, after the initial 15-year compliance period, the state housing agency cannot find a buyer for the project that will continue operating it as low-income housing.[14]  But a state may exclude the qualified contract option; the Code provides that the qualified contract option "shall not apply to the extent more stringent requirements are provided in the agreement or in State law."[15]

### 2. Alaska Housing Finance Corporation's allocation plan

Alaska Housing Finance Corporation (AHFC) is a public corporation[16] responsible for administering Alaska's LIHTC program.[17]  AHFC's Greater Opportunities for Affordable Living Program Rating and Award Criteria Plan (GOAL program) serves as the agency's allocation plan.[18]  In August 1999 AHFC announced its GOAL program for fiscal year 2000.  The program sought "to encourage the responsible development of housing for lower-income persons and families through the allocation

---

[12]     I.R.C. § 42(h)(6)(E)(i)(I).

[13]     *See* I.R.C. § 42(h)(6)(E)(i)(II).

[14]     *Id.*

[15]     *Id.*

[16]     AS 18.56.020; *see also Anderson v. Alaska Hous. Fin. Corp.*, 462 P.3d 19, 26-27 (Alaska 2020) (describing AHFC as legislatively created state actor "wholly controlled by the State through its appointees" to further goal of "address[ing] the shortage of residential housing available to low- and middle-income Alaskans").

[17]     *Low Income Housing Tax Credit*, ALASKA HOUS. FIN. CORP., https://www.ahfc.us/pros/homelessness/development-grants/low-income-housing-tax-credit (last visited Dec. 2, 2020).

[18]     *See id.*

of GOAL program funds." AHFC stated that it would use the GOAL program criteria to distribute the program funds, including tax credits. The GOAL program established how AHFC would score applications. The second criterion, titled "Extended Low-Income Project Use," stated: "Six (6) Points will be awarded to applications that commit the project to an extended low-income use equaling 30 years. An extended use agreement . . . is required."

### 3. The Creekside project

Creekside Limited Partnership initially consisted of general partner Alpine Partners, Ltd., a for-profit developer, and limited partner Anchorage Mutual Housing Association (AMHA), a non-profit organization.[19] Creekside applied for tax credits under the 2000 GOAL program in October 1999. Creekside proposed to construct a 30-unit, low-income housing project in Girdwood. Creekside awarded itself six additional qualifying points in its application for "Extended Low Income project use," stating the project would "maintain affordability for a 30 year period."

AHFC sent a December 1999 notice of intent to award tax credits to Creekside for its project. AHFC indicated it would send Creekside a "reservation agreement" that, along with other documents, would "outline specific project requirements in accordance with representations made . . . in [Creekside's] application, as well as federal and/or state programmatic requirements which may be applicable." Creekside's representative signed the acceptance letter attached to the award letter.

---

[19] Alpine developed the property and AMHA was to manage it. AMHA later left the project; Community Development, Inc. (CDI) joined as a limited partner and later became general partner. CDI is a non-profit corporation involved in development, management, and ownership of low-income housing projects in Alaska and other states. When CDI became involved in the project in 2001, it formed Creekside-Alyeska, LLC. Creekside now consists of general partner Creekside-Alyeska, LLC, owned in its entirety by CDI.

AHFC subsequently sent Creekside the 2000 LIHTC reservation agreement, which provided: "The owner agrees to maintain all project characteristics certified to in the tax credit application for 30 years. These characteristics will be included in the restrictive covenant which is required for this property." One of these "characteristics" was that "100% of the residential rental units are reserved for families at or below 60% of the median income." Creekside's representative signed the reservation agreement.

Creekside entered into a land use restrictive agreement with AHFC in December 2001.[20] Creekside agreed to "lease one hundred percent (100%) of the residential rental units in the [c]omplex to individuals or families whose income is sixty (60) percent or less of area median gross income"; it also agreed to do so for 30 years, beginning when the apartment complex became a qualified low-income housing project. Notwithstanding this 30-year requirement, the agreement provided that "the extended use period for any building which is part of the [project] shall terminate: [o]n the date the building is acquired by foreclosure or instrument in lieu of foreclosure."

### 4. Creekside's attempt to terminate affordability restrictions

In January 2018 Creekside requested to exercise the qualified contract option described in the Internal Revenue Code to terminate the project's affordability restrictions.[21] AHFC denied this request on the ground that Creekside had committed to maintaining the affordability restriction for the full 30 years without a qualified contract option.

### B. Proceedings

Creekside sued AHFC in April 2018, seeking declaratory judgment that

---

[20]     *See* I.R.C. § 42(h)(6)(B)(vi) (requiring agreement for tax credits to be recorded as restrictive covenant).

[21]     *See* I.R.C. § 42(h)(6)(E)(i)(II).

Creekside had "not waived [its] right to exercise the qualified contract option." The parties filed cross-motions for summary judgment.[22] Creekside argued that it could exercise the qualified contract option because it had never waived the right to do so. Creekside stated that it believed it was merely complying with federal law when it claimed the six points for a 30-year extended project life in its application and asserted that AHFC did not communicate to applicants that claiming the six points "would be construed as a waiver." AHFC responded that Creekside chose to accept Alaska's "more stringent requirements" by claiming the six points on its application and that the land use restrictive agreement reflected this aspect of the project agreement.

The superior court held oral argument on the motions in March 2019. Later in March the court issued an order granting AHFC's summary judgment motion and denying Creekside's summary judgment motion. The court later denied Creekside's reconsideration motion.

Creekside now appeals both the superior court's grant of AHFC's summary judgment motion and denial of Creekside's reconsideration motion.

## III. STANDARD OF REVIEW

"We review grants of summary judgment de novo."[23] We will affirm "if the record presents no genuine issue of material fact and if the movant is entitled to

---

[22]    *See* Alaska R. Civ. P. 56(c) (stating summary judgment is proper if "there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law"); *see also James v. Alaska Frontier Constructors, Inc.*, 468 P.3d 711, 717 (Alaska 2020) ("Summary judgment is proper only when undisputed material facts lead to the conclusion that a party is entitled to judgment as a matter of law.").

[23]    *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 516 (Alaska 2014).

judgment as a matter of law."[24]

"Questions of contract interpretation are generally questions of law which [are] reviewed de novo."[25]  But factual questions exist "when the meaning of contract language depends on conflicting extrinsic evidence."[26]  Finally, "[t]he question of the meaning of a written contract, including a review of the extrinsic evidence to determine whether any of the extrinsic evidence is conflicting, is a legal question which we review de novo."[27]

"We review the denial of a motion for reconsideration for abuse of discretion."[28]  An "[a]buse of discretion will be found 'when the decision on review is manifestly unreasonable.' "[29]

## IV.   DISCUSSION

### A.   The Qualified Contract Option Is Not Available To Creekside.

As discussed above, under federal law there are two ways a developer using tax credits for a low-income housing project can end affordability restrictions prior to 30

---

**24**     *Hagen v. Strobel*, 353 P.3d 799, 802 (Alaska 2015) (quoting *Kelly v. Municipality of Anchorage*, 270 P.3d 801, 803 (Alaska 2012)).

**25**     *Estate of Polushkin ex rel. Polushkin v. Maw*, 170 P.3d 162, 167 (Alaska 2007).

**26**     *Id.*

**27**     *Id.*

**28**     *Szabo v. Municipality of Anchorage*, 320 P.3d 809, 813 (Alaska 2014).

**29**     *Harper v. BioLife Energy Sys., Inc.*, 426 P.3d 1067, 1071 (Alaska 2018) (quoting *Timothy W. v. Julia M.*, 403 P.3d 1095, 1100 (Alaska 2017)); *see Sharpe v. Sharpe*, 366 P.3d 66, 68 (Alaska 2016) ("A superior court abuses its discretion by making a decision that is arbitrary, capricious, manifestly unreasonable, or . . . stem[s] from an improper motive." (alterations in original) (quoting *Morris v. Horn*, 219 P.3d 198, 203-04 (Alaska 2009))).

years: (1) foreclosure of the project property, or (2) the qualified contract option.[30] The qualified contract option does "not apply to the extent more stringent requirements are provided in the agreement or in State law," but there is no such exception for foreclosure.[31]

When granting summary judgment for AHFC, the superior court concluded that Creekside had "agreed to an affordability requirement that is more stringent than the federal baseline." Applying basic contract principles, the superior court determined that the written documents clearly showed Creekside took the 6 extra qualifying points in exchange for maintaining affordability for 30 years. Looking within the four corners of the project's land use restrictive agreement that created the affordability covenant, the court concluded that the agreement's "silence on the [q]ualified [c]ontract [o]ption shows that the [q]ualified [c]ontract [o]ption [was] not available." The court explained that Creekside produced no "admissible evidence of ambiguity," noting that it had not refuted the contract documents' "plain language" and would be unable to provide any evidence doing so because its "contrary reading would mean [it] got something for nothing." The court thus determined that AHFC was entitled to judgment as a matter of law and granted summary judgment for AHFC.

Creekside asserts that the superior court improperly concluded the qualified contract option was unavailable to Creekside. Creekside raises a number of arguments: (1) the allocation plan language was ambiguous and Creekside believed it was merely agreeing to federal requirements by claiming the six extra points on its application; (2) the land use restrictive agreement does not govern because it was entered into after construction had begun; (3) the land use restrictive agreement was an improper

---

[30] I.R.C. § 42(h)(6)(E)(i).

[31] *Id.*

modification of the earlier contract documents; (4) the land use restrictive agreement mentioning foreclosure but not the qualified contract option did not mean that the qualified contract option was unavailable; (5) an unpublished New Jersey decision suggested a different result; and (6) the court should have applied waiver law principles.

We agree with the superior court's conclusion that the allocation plan language was not ambiguous and that it is unreasonable for Creekside to believe it was awarded the 6 additional points merely for agreeing to federal requirements and not for agreeing with AHFC's 30-year affordability commitment. The agreement between Creekside and AHFC involved a number of documents: the 1999 application, the notice of intent to award, the reservation form, and the land use restrictive agreement. The following undisputed facts are relevant to this dispute: (1) in Creekside's 1999 application it claimed 6 qualifying points for agreeing that the "[p]roject will maintain affordability for a 30 year period"; (2) Creekside signed the notice of intent to award in 1999, agreeing to later sign a reservation agreement; (3) the reservation form Creekside signed in 2000 required it to "maintain all project characteristics certified to in the tax credit application for 30 years," including the affordability requirements for all units; and (4) the land use restrictive agreement Creekside signed in 2001 created a covenant running with the land, which required it to maintain affordability on all units for 30 years and mentioned early termination only if there were a "foreclosure or instrument in lieu of foreclosure." This clearly demonstrates that Creekside committed to maintaining project affordability for 30 years; Creekside's 30-year affordability commitment to AHFC was more stringent than federal law requires but nonetheless authorized by federal law.

### B. Summary Judgment For AHFC Was Proper.

Creekside argues that summary judgment for AHFC was improper because there were disputed issues of material fact. Creekside contends that it "did not intend to

waive the [q]ualified [c]ontract right or agree to more stringent requirements," pointing to a representative's affidavit as support. Creekside also points to other evidence it says demonstrates its actual intent, including that in 2017 it "initiated the [q]ualified [c]ontract process by engaging consultants, reviewing the property documents, and setting up a conference call with AHFC."

This argument is unconvincing. Summary judgment is not proper when the non-moving party shows "that a genuine issue of material fact exists to be litigated."[32] "But . . . the offered evidence must not be too conclusory, too speculative, or too incredible to be believed, and it must directly contradict the moving party's evidence."[33] The representative's affidavit is conclusory; Creekside cannot survive summary judgment on a contract issue merely by now stating that its prior subjective intent was not to give up the qualified contract option.[34] And evidence of Creekside's actions in 2017 — namely that it tried to assert the qualified contract option — does not address the reasonable expectations of the parties when they entered into the contract over 15 years earlier. Creekside simply has no admissible evidence of a contemporaneous subjective intent contrary to the project documents. Because there was no genuine

---

[32] *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 519 (Alaska 2014) (quoting *Lockwood v. Geico Gen. Ins. Co.*, 323 P.3d 691, 696 (Alaska 2014)).

[33] *Id.* at 516.

[34] *See Peterson v. Wirum*, 625 P.2d 866, 870 (Alaska 1981) ("Differences of opinion among the parties as to their subjective intent, expressed during the litigation, do not establish an issue of fact regarding the parties' reasonable expectations at the time they entered into the contract, since such self-serving statements are not considered to be probative."); *cf. AAA Valley Gravel, Inc. v. Totaro*, 219 P.3d 153, 169-70 (Alaska 2009)- ("[U]nambiguous contract language is not rendered ambiguous simply because the parties disagree on their intent at the time of contracting, [or] because they advance different interpretations during the course of litigation . . . .").

dispute of material fact, the superior court properly granted summary judgment for AHFC.

Creekside's other appeal arguments compel no different result. The fact that the land use restrictive agreement was executed later in time than the other documents does not make it irrelevant, nor did it constitute an improper modification of the earlier documents. Creekside knew when it applied for the project that, based on federal law, it would have to sign a land use restrictive agreement.[35] And the notice of intent letter mentioned the reservation form, which in turn mentioned the land use restrictive agreement. The land use restrictive agreement did not modify earlier agreements; consistent with Creekside's claim of the six points for an extended project term, it provided foreclosure as the only early termination option.

The unpublished New Jersey decision Creekside points to is not analogous. In that case New Jersey tried to prevent a developer from terminating the affordability requirements early due to foreclosure; the trial court determined, and the appellate court affirmed, that New Jersey could not do so under federal law.[36] That differs from this case: federal law allows states to apply more stringent requirements to eliminate the qualified contract option, but federal law does not allow states to restrict a developer's ability to terminate affordability restrictions upon foreclosure.[37]

Unlike the New Jersey case Creekside points to, a recent Hawaii federal district court decision is directly relevant, and it supports the superior court's ruling. In

---

[35] *See* I.R.C. § 42(h)(6)(B)(vi) (requiring agreement for tax credits to be recorded as restrictive covenant).

[36] *Mfrs. & Traders Trust Co. v. Marina Bay Towers Urban Renewal II, LP*, No. A-5879-17T2, 2019 WL 5395937, at *12, *15-16 (N.J. Super. App. Div. Oct. 22, 2019) (per curiam).

[37] *See* I.R.C. § 42(h)(6)(E)(i).

*Tuttle v. Front Street Affordable Housing Partners* the developer of an affordable housing complex applied for, and the state housing authority granted, an early release from the affordability commitment.[38] Like Creekside, the *Tuttle* developer had utilized tax credits under the state's LIHTC program and agreed to a restrictive covenant on the property.[39] The covenant included a 51-year affordability period in exchange for receiving the tax credits.[40] After receiving notice that LIHTC restrictions nonetheless would be lifted, and in anticipation that rents subsequently would increase to market rates, residents sued the developer and the state housing authority for breach of the restrictive covenant.[41] Applying Hawaii law, the federal district court held that the qualified contract exception was unavailable and thus the developer's early release from the covenant was void; it concluded the covenant requiring affordability for the full 51-year term must be reinstated.[42] The court determined, using contract interpretation rules, that the "expressed intent [in a restrictive covenant] is controlling and unexpressed intent is generally unavailing."[43] The superior court in this case likewise applied contract rules and found that the qualified contract option was unavailable based on the developer's agreement to more stringent affordability requirements than the federal baseline.

Finally, Creekside asserts that the superior court should have applied waiver law principles in deciding the summary judgment motion. "Waiver is generally defined

---

[38]     478 F. Supp. 3d 1030, 1034 (D. Haw. 2020).

[39]     *Id.* at 1036-37.

[40]     *Id.*

[41]     *Id.* at 1038.

[42]     *Id.* at 1034, 1039-43, 1049.

[43]     *Id.* at 1040 (emphasis omitted).

as 'the intentional relinquishment of a known right.' "[44] Waiver "can be accomplished by an express statement or by conduct that is 'inconsistent with any other intention than a waiver, or where neglect to insist upon the right results in prejudice to another party.' "[45] Proving implied waiver of a legal right requires "direct, unequivocal conduct indicating a purpose to abandon or waive the legal right, or acts amounting to an estoppel by the party whose conduct is to be construed as a waiver."[46] The superior court concluded that waiver theory did not apply.

Creekside made no viable evidentiary showing that it had a right to exercise the qualified contract option, and the Code's explicit statement that states may eliminate the qualified contract option with more stringent requirements indicates that Creekside did not have such a right. Further, for the reasons described above, Creekside's actions were consistent with an intent to commit to maintaining affordability requirements for 30 years without the possibility of early termination through the qualified contract option. The Code does not create a right to a qualified contract option that a developer "waives." The Code allows states to eliminate the qualified contract option. The superior court correctly concluded that Creekside applied for and received tax credits in exchange for executing relevant contract documents for a low-income housing project with an extended 30-year life and no qualified contract option.

---

[44]     *Milne v. Anderson*, 576 P.2d 109, 112 (Alaska 1978) (quoting *Arctic Contractors, Inc. v. State*, 564 P.2d 30, 40 (Alaska 1977)).

[45]     *Powercorp Alaska, LLC v. Alaska Energy Auth.*, 290 P.3d 1173, 1185 (Alaska 2012) (quoting *Carr-Gottstein Foods Co. v. Wasilla, LLC*, 182 P.3d 1131, 1136 (Alaska 2008)).

[46]     *Milne*, 576 P.2d at 112.

**C.      The Superior Court Did Not Abuse Its Discretion By Denying Creekside's Motion For Reconsideration**.

Creekside contends that the superior court erred by rejecting Creekside's motion for reconsideration.[47] "Under Alaska Civil Rule 77(k)(1)(ii), a party may ask the court to reconsider a ruling previously decided if, in reaching its decision, the court has overlooked or misconceived some material fact or proposition of law."[48] Creekside asserted three main arguments for reconsideration. First, Creekside argued that it never intended to waive the qualified contract option and there thus was a genuine dispute of material fact regarding the parties' intent. The court dismissed this argument as "conclusory" and "speculative." Second, Creekside argued that its claim and acceptance of the six qualifying points for an extended project life was merely a statement of compliance with federal law and that there was a material factual dispute regarding the significance of the six additional points in the application. Again, the court dismissed Creekside's argument as "speculative and unsubstantiated" based on the contemporaneous project development record. Third, Creekside argued that "the legal issue should be considered in the context of waiver," claiming the documents AHFC produced in discovery showed AHFC intended the applicants to waive the right to the qualified contract option, as opposed to AHFC's later assertion that the six points were an "incentive." The court explained it had not overlooked or failed to consider waiver principles in its decision but instead "(1) considered and rejected their applicability, and (2) determined that principles of contract law controlled."

---

[47]      The correct standard of review is abuse of discretion. *See Szabo v. Municipality of Anchorage*, 320 P.3d 809, 813 (Alaska 2014).

[48]      *Alaskan Adventure Tours, Inc. v. City & Borough of Yakutat*, 307 P.3d 955, 963 n.23 (Alaska 2013).

The superior court clearly explained how it had not overlooked Creekside's evidence or legal arguments but instead considered and rejected them. Because the court adequately considered all of Creekside's factual and legal arguments and properly granted summary judgment for AHFC, the court did not abuse its discretion by denying Creekside's motion for reconsideration.[49]

## V. CONCLUSION

We AFFIRM the superior court's rulings and judgment.

---

[49] *Cf. Szabo*, 320 P.3d at 816 (upholding denial of reconsideration motion after court "adequately considered" movant's arguments).