*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| FLINT HILLS RESOURCES ALASKA, LLC, | ) ) ) | Supreme Court No. S-15654 |
| Appellant, | ) ) | Superior Court No. 4FA-10-01123 CI |
| v. | ) ) | O P I N I O N |
| WILLIAMS ALASKA PETROLEUM, INC. and THE WILLIAMS COMPANIES, INC., | ) ) ) ) | No. 7124 – August 26, 2016 |
| Appellees. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael P. McConahy, Judge.

Appearances: Leon T. Vance and Lael A. Harrison, Faulkner Banfield, P.C., Juneau, Kathleen M. Sullivan, Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York, Christopher Tayback, Valerie Lozano, and Andrew March, Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, California, and Charles F. Webber, Faegre Baker Daniels, Minneapolis, Minnesota, for Appellant. Richard W. Maki, Tindall, Bennett & Shoup, Anchorage, for Appellees.

Before: Stowers, Chief Justice, Fabe, Winfree, Maassen, and Bolger, Justices.

STOWERS, Chief Justice.

# I. INTRODUCTION

Williams Alaska Petroleum owned the North Pole refinery until 2004. Williams knew that the then-unregulated chemical sulfolane, a solvent, was present in refinery property groundwater, but it did not know that the sulfolane had migrated off the refinery property via underground water flow.

Flint Hills Resources Alaska bought the North Pole refinery from Williams in 2004 pursuant to a contract that contained detailed terms regarding environmental liabilities, indemnification, and damages caps. Almost immediately the Alaska Department of Environmental Conservation informed Flint Hills that sulfolane was to be a regulated chemical and that Flint Hills needed to find the source of the sulfolane in the groundwater. The Department contacted Flint Hills again in 2006 with the same message. Meanwhile, Flint Hills's environmental contractor repeatedly warned Flint Hills that sulfolane could be leaving the refinery property and that more work was necessary to ascertain the extent of the problem.

In 2008 Flint Hills drilled perimeter wells and discovered that sulfolane was migrating beyond its property and had contaminated drinking water in North Pole. A North Pole resident sued Flint Hills and Williams, and Flint Hills cross-claimed against Williams for indemnification. After extensive motion practice the superior court dismissed all of Flint Hills's claims against Williams as time-barred.

Flint Hills appeals. We hold that the superior court correctly applied the contract's damages cap provision, but we conclude that it was error to find that Flint Hills's contractual indemnification claims and part of its statutory claims were time-barred. We also affirm the court's dismissal of Flint Hills's equitable claims.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Williams owned and operated the North Pole refinery from approximately 1977 through 2004.  In 2001 Williams discovered sulfolane in the refinery's groundwater.  Sulfolane is a manufactured chemical developed as a solvent; refiners use sulfolane to strip out parts of crude oil used to make gasoline.  When Williams discovered the presence of sulfolane in the groundwater, sulfolane was not a regulated chemical.

Shannon & Wilson, Williams's environmental contractor, identified the sulfolane in 2001.  At that time no one recommended that Williams install additional monitoring infrastructure for sulfolane.  Although the Department directed Williams to continue sampling for sulfolane to determine its source, Williams stopped sampling in 2002 and instead attempted to find the leak by performing equipment inspections.

In April 2004 Flint Hills purchased the refinery from Williams through a detailed Asset Sale and Purchase Agreement.  Flint Hills agreed to assume responsibility for "all existing, known contamination at the [refinery] property specifically identified in the referenced figures, tables and texts," which included a document listing sulfolane concentrations at various wells on the property.  The Agreement also set out detailed terms regarding indemnification and damages caps.  Flint Hills retained the majority of Williams's environmental staff and all of its refinery environmental files.

In subsequent litigation the superior court found that Flint Hills "knew and understood that there was sulfolane on the refinery property as of 2004, and in fact agreed to take responsibility for the sulfolane that was 'existing, known[,]' and disclosed as of that date."  At the time of sale the parties believed that the sulfolane was only

onsite.[1] But the superior court found: "As everyone is aware of now, the sulfolane released prior to Flint Hills'[s] assumption of ownership of the refinery had migrated far beyond the contours of the sulfolane identified in the disclosure schedule to the [Agreement] and the plume had already extended off of the refinery property."

In June 2004 Flint Hills requested a study from Shannon & Wilson to "gain a comprehensive understanding of the distribution of subsurface contamination" on the property. Shannon & Wilson advised Flint Hills that sulfolane had been discovered in areas previously thought to be uncontaminated and proposed to "assess [the] distribution and concentration trends." At the same time the Department advised Flint Hills that it needed to locate the sulfolane's sources.

In September 2004 Shannon & Wilson discovered sulfolane in samples from a monitoring well in the northern part of the property; sulfolane was not found there during a 2001 sampling. Shannon & Wilson suggested monthly sampling and told Flint Hills that "sulfolane was essentially non-degradable in the anaerobic conditions of the aquifer under the refinery and that sulfolane is miscible in (mixes with) water and is not retarded in its subsurface migration."

In October 2004 the Department again advised Flint Hills that "[t]he source(s) of [s]ulfolane in the ground water at the refinery needs to be determined. The chemical [s]ulfolane will be considered a regulated contaminant." Flint Hills was unable to find any release sources for sulfolane, so it concluded that the sulfolane must have been released by Williams prior to Flint Hills's assumption of ownership.

In early 2005 Shannon & Wilson proposed that Flint Hills install "three groundwater monitoring wells along the estimated northern boundary of the dissolved

---

[1] The parties were more concerned about two other plumes of chemicals in the groundwater: a combination of benzene, toluene, ethyl benzene, and xylenes, and a plume of light non-aqueous phase liquid.

benzene groundwater plume[] to serve as sentry wells capable of detecting subsurface contaminant migration off the facility." It also informed Flint Hills that the sulfolane concentration at one monitoring well was more than 11 times greater than it was in 2001. The Department agreed with the installation of the new wells. Shannon & Wilson installed three new groundwater monitoring wells in August and September 2005. A sample from one of the wells down-gradient in groundwater flow tested positive for sulfolane.

In January 2006 the Department sent another letter to Flint Hills reiterating that "[t]he source(s) of the [s]ulfolane in the ground water at the refinery needs to be determined. The chemical [s]ulfolane will be considered a regulated contaminant." In April, Shannon & Wilson proposed a groundwater monitoring program, reminding Flint Hills that sulfolane was highly soluble and would migrate with the groundwater.

Samples from April through June 2006 indicated the continued presence of sulfolane at levels near or exceeding the cleanup standard. Shannon & Wilson informed Flint Hills that it believed sulfolane was constantly leaching into groundwater, in contrast to an acute surface release. Shannon & Wilson noted that because it found sulfolane in the northernmost monitoring wells, "it would be appropriate to identify the down gradient extent of the sulfolane plume"; it recommended installing sentry wells at the property's boundary.

Shannon & Wilson presented its final results in October 2006. It again advised Flint Hills that sulfolane is highly soluble and is likely to travel with groundwater instead of biodegrading and that there was likely a source of continuous contamination that was causing the stable readings observed in the monitoring wells. It concluded that "[t]he extent of the subsurface sulfolane contamination has not been determined, and the sources of this contamination remain poorly defined." It again recommended installing sentry wells at the property boundary to determine if the

sulfolane had already migrated beyond the refinery property. In November 2006 the Department sent a letter agreeing with all of Shannon & Wilson's recommendations. The Flint Hills engineer responsible for the groundwater program believed, based on the Department's letter, that the Department expected Flint Hills to implement Shannon & Wilson's recommendations, and she thought that boundary wells were "a necessary addition to the program."

In December 2006 and January 2007 Shannon & Wilson continued to reference the need to install the monitoring wells. In mid-2007 Flint Hills hired Barr Engineering to conduct a "cold eye review" of Shannon & Wilson's work. In August 2008 Barr Engineering concluded that the sulfolane had possibly migrated "beyond [Flint Hills Refinery] property" and that "[t]o date, it appears that little effort has been made to characterize the actual release locations."

Thus in August 2008 Flint Hills began installing the monitoring wells; they were completed in October. In September 2008 Flint Hills placed additional monitoring wells at the property boundary. These wells "promptly confirmed" that sulfolane had migrated beyond the refinery's premises. The superior court found that despite some Flint Hills witnesses' assertions that "they did not know for certain at that time that sulfolane was offsite, Flint Hills indisputably knew that sulfolane was offsite at that point in time, and ha[d] so admitted to th[e] court." The sulfolane plume was approximately 1,300 feet wide.

In an addendum to its "cold eye review," Barr Engineering stated in January 2009 that the plume possibly extended offsite but that it did not know for sure how far offsite. Wells drilled in 2009 confirmed this.

B.    Proceedings

In January 2010 a North Pole homeowner, James West, filed suit against both Flint Hills and Williams, alleging that he suffered damages from sulfolane

contamination in his drinking water. In May 2010 Flint Hills filed a cross-claim against Williams for expenses incurred in remediation efforts. The parties eventually settled West's claims, but Flint Hills and Williams continued litigating the cross-claim.

In November 2011 Williams filed two summary judgment motions. The first argued that Williams had no obligation to indemnify Flint Hills because under the Agreement Flint Hills assumed responsibility for all disclosed contamination, including sulfolane. The second argued that Flint Hills had been on notice of sulfolane's presence since 2004 but had failed to bring suit until 2010 and that the three-year statute of limitations for contract claims had expired long before Flint Hills brought its claim.

Flint Hills filed a contemporaneous motion for partial summary judgment, seeking judgment in its favor on six main issues: (1) the refinery was the sole source of the sulfolane; (2) the sulfolane plume was an "Environmental Condition" under the Agreement; (3) the sulfolane that had migrated off the premises as of Flint Hills's purchase was attributable to Williams; (4) Williams did not disclose in the Agreement that sulfolane had migrated beyond refinery property; (5) Williams was required to indemnify Flint Hills for any damages Flint Hills incurred remediating the sulfolane that had migrated beyond property boundary before Flint Hills's purchase; and (6) Williams's liability to Flint Hills was not subject to the Agreement's "Environmental Cap."

Flint Hills filed a second amended complaint in March 2012 adding claims for statutory damages, breach of contract for retained liabilities, and claims under the Guaranty (an attendant document to the Agreement). It also responded to Williams's motion for summary judgment based on the statute of limitations and argued that a finding that Flint Hills's claims were time-barred would violate the Agreement.

In April 2012 the superior court ruled on three of Flint Hills's requests for summary judgment. The court held that the North Pole refinery was the only source of sulfolane in the area, that the offsite sulfolane was an "Environmental Condition" under

the Agreement, and that the sulfolane off the refinery premises at the time of Flint Hills's purchase was attributable to Williams. The court did not address which party was responsible for the cleanup or Flint Hills's inaction. And the court denied summary judgment on Williams's argument that Williams had no obligation to indemnify Flint Hills under the Agreement because it determined the Agreement was ambiguous on this issue and subject to different interpretations regarding its scope.

The superior court also ruled on Williams's motion for summary judgment on Flint Hills's contractual indemnity claim based on the statute of limitations. The court held that under Alaska law the statute of limitations on contractual indemnity claims began running when "Flint Hills first incurred liability or a monetary obligation attributable to the offsite sulfolane contamination." The court explained this was in accord with Alaska's approach to tort indemnification claims. But the court found that there were unresolved issues of fact regarding "(1) when Flint Hills first paid damages relating to the sulfolane contamination and (2) when Flint Hills first was placed upon inquiry notice that sulfolane contamination had moved beyond the refinery's property (thereby triggering the three-year statute of limitations)." The court ordered an evidentiary hearing to resolve these questions of fact.

Williams and Flint Hills both moved for reconsideration. Williams asked for clarification on whether payments for onsite damages and onsite diminution in value would trigger the limitations period. Flint Hills, on the other hand, completely changed its legal position, asserting that "[f]urther research ha[d] persuaded [it] that it was wrong about the Supreme Court of Alaska not having addressed the time of accrual of a contractual-indemnification claim." Flint Hills cited to insurance cases and argued that the statute did not begin to run until Flint Hills asked Williams for indemnification and Williams refused to indemnify Flint Hills. And it argued that the diminution in value claim was part and parcel of the indemnification claim, so the statute of limitations

should not have started running on this claim until Flint Hills had demanded indemnification and Williams had refused to pay.

The superior court denied Flint Hills's motion for reconsideration, explaining that Flint Hills's new authority did "not support [the] proposition that a party can incur damages, sit on those damages for as long as they want, demand reimbursement of the damages, and then sue when they are refused without violating the statute of limitations." The court distinguished Flint Hills's new cases because they involved insurance and contracts of adhesion. The court agreed with Flint Hills that the diminution in value claim was an indemnification claim and subject to the same limitations period as the other indemnification claims. But the court held that "[t]he statute of limitations began to run when Flint Hills had sufficient information to alert it of a potential cause of action [for] the refinery's value."

The parties also moved for summary judgment on the statutory claims.[2] Flint Hills argued that the statutory claims sounded in trespass and interference with property and therefore should be subject to a six-year statute of limitations; Williams argued that the claims should be governed by the two-year statute of limitations for claims created by statute. The superior court concluded that the two-year limitations period applied to the statutory claims because the "nature of the injury alleged arises from the [Agreement], not a trespass on land or even a trespass on the case." But the court found that the actual accrual date was a question of fact. Responding to Flint Hills's earlier summary judgment motion arguing that the sulfolane damages were not subject to the damages cap, the court held that because the sulfolane contamination was

---

[2]     Flint Hills claimed that Williams was strictly liable under AS 46.03.822(a) for damages relating to the release of hazardous substances and that Flint Hills could seek contribution from Williams for those damages under AS 46.03.822(j).

an Environmental Damage under the Agreement, it was subject to the Agreement's damages cap.

The superior court held a five-day evidentiary hearing and subsequently issued a 50-page order granting summary judgment to Williams on all of Flint Hills's claims. The court reiterated its prior rulings that the indemnification claim arose under the Agreement and was thus governed by a three-year contract statute of limitations and that the statutory claims were governed by a two-year statute of limitations. The court noted that under the "discovery rule" the statute of limitations begins to run on "the date when a reasonable person has enough information to alert that person that he or she has a potential cause of action or should begin an inquiry to protect his or her rights." The court found:

> Based on all the information available to it, including [the Department's] directives, the results from the monitoring well sampling, and Shannon & Wilson's reports and recommendations, Flint Hills reasonably should have concluded long before May 10, 2007, that sulfolane had migrated beyond the sampling disclosed as part of the [Agreement] and off the refinery property. Such information would have supported Flint Hills's claim for diminution of the refinery's value attributable to the sulfolane.

It thus concluded Flint Hills's contractual claims were barred by the three-year statute of limitations.

Turning to the statutory claims, the superior court held that Flint Hills's claim under AS 46.03.822(a) for damages from the release of hazardous substances was also time-barred. It found that the claim accrued along with the indemnification claims and that the two-year statute of limitations was triggered when sulfolane became a regulated chemical in October 2004. On Flint Hills's AS 46.03.822(j) statutory contributions claim, the court held that the Department's 2004 and 2006 letters qualified as "potential liability determinations" because they "gave clear notice of [the

Department's] interest in the release of sulfolane, and both letters advised Flint Hills of the need to clean up the sulfolane." The court did not rule on Flint Hills's motion regarding its equitable claims.

Flint Hills filed a motion for reconsideration regarding the court's failure to rule on its equitable claims, including its claims for specific performance and declaratory judgment and that Williams was obligated to retain and discharge liabilities. In its responsive order the superior court held that because the "equity" that Flint Hills requested "was for Williams to pay the same monetary value as [it] would have under the contract claims," "the equitable claims [were] barred based on the legal principle that equitable relief is only available in the absence of an adequate legal remedy." The court explained that "Flint Hills had an adequate legal remedy, but lost it due to delay in bringing its claims." The court additionally found Williams had met its burden to show that Flint Hills's equitable claims were barred by laches, "expressly finding that Flint Hills delayed asserting [its] equitable claims for an unconscionable period of time, and that this delay prejudiced Williams."

Flint Hills appeals.

## III. STANDARD OF REVIEW

We review a grant of summary judgment de novo and may affirm on any grounds supported by the record.[3] "Contract interpretation is a question of law subject to de novo review."[4] We also review de novo the question of which accrual standard to use in determining when a claim accrues.[5] "When the superior court holds an evidentiary

---

[3]     *Windel v. Mat-Su Title Ins. Agency, Inc.*, 305 P.3d 264, 270 (Alaska 2013).

[4]     *ConocoPhillips Alaska, Inc. v. Williams Alaska Petroleum, Inc.*, 322 P.3d 114, 122 (Alaska 2014).

[5]     *Gefre v. Davis Wright Tremaine, LLP*, 306 P.3d 1264, 1271 (Alaska 2013).

hearing to resolve factual disputes about when a statute of limitations began to run, we review the resulting findings of fact for clear error."[6] We review the decision to grant equitable relief for an abuse of discretion[7] because equitable relief is "a matter addressed to the sound discretion of the trial court."[8]

## IV. DISCUSSION

On appeal Flint Hills argues that (1) the statute of limitations on the contract claims did not begin to run until its request for indemnification was rejected; (2) the statutory claims were not triggered until Flint Hills received a liability decision from the Department *after* the statute was amended in 2006; (3) the Agreement's damages cap does not apply to its claims; and (4) the doctrine of laches did not bar its equitable claims. We hold that it was error to conclude that the contractual indemnification claims were time-barred; we conclude a six-year statute of limitations applies for statutory claims arising from sulfolane leakage off-property but we also conclude that a two-year statute of limitations applies for sulfolane remaining on Flint Hills's property. We also hold that the superior court properly dismissed Flint Hills's equitable claims and correctly determined that the Agreement's damages cap applied to Flint Hills's claims.

### A. It Was Error To Conclude That The Statute Of Limitations Barred The Contractual Indemnity Claim.

Flint Hills argues that the superior court erred when it concluded that the three-year contract statute of limitations barred its contractual indemnity claim. It asserts that "the statute of limitations for indemnification claims does not begin to run until the party with the duty to indemnify refuses to pay or otherwise breaches its obligation."

---

[6] *Christianson v. Conrad-Houston Ins.*, 318 P.3d 390, 396 (Alaska 2014).

[7] *See Wagner v. Wagner*, 205 P.3d 306, 309 (Alaska 2009).

[8] *Moran v. Holman*, 501 P.2d 769, 771 (Alaska 1972).

-12- **7124**

Thus, it contends that the statute of limitations began to run on March 5, 2010, when Williams allegedly refused Flint Hills's requests for indemnification; if this is correct Flint Hills's claim would fall well within the statute of limitations because it filed its complaint on May 10, 2010.[9]

The superior court disagreed with Flint Hills's proposed claim accrual standard and explained in its order that Flint Hills's claim for contractual indemnity accrued when Flint Hills first sustained damages or a loss for which indemnification could have been claimed. The court found that all of the elements of the indemnity claim existed on April 1, 2004 — when Flint Hills purchased the refinery — because sulfolane contamination was much greater than disclosed in the Agreement. But it also found that Flint Hills had no reason to know the extent of the contamination until the July 2004 meeting with the Department, Shannon & Wilson's September 2004 report, and the Department's October 2004 letter. The court therefore determined that the three-year contract statute of limitations had expired long before Flint Hills filed its complaint.

We have not previously determined when the statute of limitations accrues on a pure contractual indemnity claim. The two options presented in this appeal are the date that an indemnifiable loss occurs or the date that a demand for indemnification is rejected. We begin by analyzing the contractual indemnification claims on which the parties agreed.

---

[9] In its complaint Flint Hills also alleged that Williams had breached the retained liabilities clause in the Agreement and asserted a claim for diminution of value. But at oral argument counsel for Flint Hills clarified that the indemnification clause of the Agreement required Williams to indemnify Flint Hills for damages including retained liabilities and diminution of value. We accept counsel's clarification of the issues; Flint Hills's retained liability claim is not a separate claim but instead falls within the indemnification claims.

Section 10.3 of the Agreement sets out the Indemnification Procedures. Section 10.3(a)(I), entitled "Notice of Claims," identifies the process by which an Indemnified Party must notify the Indemnifying Party of a claim. Where an Indemnifying Party could be liable to an Indemnified Party under the Agreement, the Indemnified Party shall

> with reasonable promptness send to the Indemnifying Party a written [Claim Notice] . . . , provided that a delay or defect in notifying the Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Agreement except to the extent that (and only to the extent that) the Indemnifying Party demonstrates such failure shall have caused the Damages for which the Indemnifying Party is obligated to be greater than such Damages would have been had the Indemnified Party given the Indemnifying Party timely notice.

Flint Hills urges us to adopt the rule we have established in insurance litigation holding that "[a]n insurance company . . . breaches the duty to defend when it refuses to defend the insured and the insured is notified of the refusal"[10] and that an insurer's duty to compensate an insured is breached when the insurer refuses to compensate the insured.[11]

Williams argues that we should affirm the superior court's approach and adopt the accrual standard that we have applied in tort liability indemnity cases; in those cases the statute of limitations generally begins to run once the indemnified party actually becomes liable for damages, typically either through a settlement or a court judgment.[12] But that rule seems inapt here because there has been no determination of

---

[10]     *See Brannon v. Cont'l Cas. Co.*, 137 P.3d 280, 285 (Alaska 2006).

[11]     *Howarth v. First Nat'l Bank of Anchorage*, 540 P.2d 486, 491 (Alaska 1975).

[12]     This is because tort liability cannot be established without a settlement or
(continued...)

liability; Flint Hills did settle the lawsuit with West, but the value of that suit was very small compared to the indemnity amount Flint Hills seeks, and there has been no determination on Flint Hills's liability for that amount. Adopting the accrual standard used in tort cases for contractual indemnity cases would require Flint Hills to bring an indemnity action only after being found liable for the damages from which it seeks indemnification. In environmental indemnity cases like this, this is not a workable solution.

Williams alternatively argues that the facts in this case are similar to *Johnson v. Columbia Properties Anchorage, LP*, where a subcontractor waited several years after performance to send an invoice to a general contractor, who then refused to pay the subcontractor.[13] The Ninth Circuit held that under Alaska law "a cause of action for breach of contract accrues, thereby triggering [the statute of limitations] when the breaching party becomes obligated to perform."[14] Although the subcontractor argued that there was no obligation to pay until he sent the invoice, the court held that "an Alaska court would likely refuse to excuse this delay in starting the clock for the statute

---

[12](...continued)
judicial determination. *See Hoffman Constr. Co. of Alaska v. U.S. Fabrication & Erection, Inc.*, 32 P.3d 346, 352, 356 (Alaska 2001) (holding that the duty to indemnify "is not triggered until the indemnitee is liable for damages" and finding that one party had no liability only because the claims were settled without payment); *Alaska Gen. Alarm, Inc. v. Grinnell*, 1 P.3d 98, 105 (Alaska 2000) (noting a general rule in tort cases that the statute of limitations begins to run when a judgment is filed or a settlement is reached on the underlying tort action that establishes liability for the party seeking indemnification).

[13]     437 F.3d 894, 897-98 (9th Cir. 2006).

[14]     *Id.* at 900.

of limitations" because allowing the plaintiff to do so would frustrate such statutes.[15] But importantly, the Ninth Circuit concluded that the contract at issue "obligated Johnson to send an invoice to Columbia 'at the conclusion of the project' " and that "the invoice or invoices would be due and payable promptly after submittal."[16] The Agreement between Flint Hills and Williams contains no such clause; rather, it specifies that "a delay or defect in notifying the Indemnifying Party shall *not* relieve the Indemnifying Party of its obligations under this Agreement." (Emphasis added.)

On facts similar to those in *Johnson* the Nebraska Supreme Court found that the statute of limitations began to run when a party could have demanded payment.[17] But like in *Johnson*, no contractual provision explicitly stated that the indemnified party would not waive its rights under the contract by waiting to request payment.[18] In another late-invoice case a federal district court held that a party's cause of action arose when a demand for payment was made and refused, but it clarified that the demand for payment must have been made within a reasonable time after the demand lawfully could have been made.[19] As the Alabama Supreme Court explained, "[i]f the time for such

---

[15]    *Id*.

[16]    *Id*.

[17]    *Stock v. Meissner*, 309 N.W.2d 86, 88 (Neb. 1981) (quoting *Luikart v. Hoganson*, 281 N.W. 27, 28 (Neb. 1938)).

[18]    *See id*. at 87 ("The grain was to be paid for . . . on demand [pursuant to an oral contract].").

[19]    *Cont'l Cas. Co. v. Dr Pepper Bottling Co. of Tex.*, 416 F. Supp. 2d 497, 507 (N.D. Tex. 2006). That court found that a reasonable period of time will typically coincide with the statute of limitations period. *Id*.

performance is not definitely fixed, a reasonable time, but that only, will be allowed therefor."[20]

Case law from other jurisdictions offers conflicting accrual standards for the statute of limitations in pure contractual indemnity cases. Some courts have held that the statute of limitations begins to run once the indemnified party incurs costs or suffers the damages for which it seeks indemnity.[21] But other courts have applied the opposite rule, holding that a cause of action for breaching an indemnity claim does not accrue

---

[20] *Seybold v. Magnolia Land Co.*, 376 So. 2d 1083, 1086-87 (Ala. 1979).

[21] *See State v. Next Millenium Realty, LLC*, No. CV-03-5985(SJF)(MLO), 2007 WL 2362144, at *18 (E.D.N.Y. Aug. 14, 2007) ("[T]he statute of limitations accrues when the loss is suffered by the party seeking indemnity." (quoting *McDermott v. City of New York*, 406 N.E.2d 460, 461 (N.Y. 1980))); *Sherwin-Williams Co. v. ARTRA Grp., Inc.*, 125 F. Supp. 2d 739, 757 (D. Md. 2001) (holding that "the claim accrues at the time payment [is] made by the party seeking indemnification"); *FMC Corp. v. Northern Pump Co.*, No. 4-84-1365, 1985 WL 1555, at *3 (D. Minn. Apr. 29, 1985) ("[A] claim for contribution or indemnity does not accrue until the person entitled to the . . . indemnity has sustained damage by paying a loss or discharging a liability that should properly be the responsibility of another." (quoting *Leisure Dynamics v. Falstaff Brewing Corp.*, 298 N.W.2d 33, 38 (Minn. 1980))); *Amoco Oil Co. v. Liberty Auto & Elec. Co.*, 810 A.2d 259, 264 (Conn. 2002) (holding that "[w]hen an agreement indemnifies against both loss and liability . . . the statute of limitations begins to run as soon as liability is incurred"); *Pflanz v. Foster*, 888 N.E.2d 756, 759 (Ind. 2008) (holding that the statute of limitations began to run when the purchasers of property were required to pay for environmental cleanup where the purchasers were unaware that fuel tanks on the property were leaking); *Lyhane v. Durtschi*, 13 N.W.2d 130, 135 (Neb. 1944) (holding that "[i]t is the rule in the case of indemnity contracts that a cause of action to recover indemnity does not accrue until a loss occurs, and it follows the statute of limitation does not commence to run until that time"); *Ingersoll-Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203, 210 (Tex. 1999) (holding that an indemnification claim does not accrue until the damages are "fixed and certain by judgment").

-17-

until a demand has been made and rejected.[22] A third approach maintains that if a party's right is dependent on a preliminary act "he cannot suspend indefinitely the running of the statute of limitations by delaying the performance of the preliminary act, for it is not the policy of the law to put it within the power of a party to toll the statute of limitations."[23]

Because we have never squarely decided the accrual standard for a pure contractual indemnity clause and because the case law from other jurisdictions conflicts on this issue, we look to principles of contract interpretation. "Generally, a cause of action for breach of contract accrues, and the statute of limitations begins to run, 'at "the time of the breach of the agreement, rather than the time that actual damages are sustained as a consequence of the breach." ' "[24] Intuitively, a breach of a contractual indemnity clause occurs when the indemnifying party refuses to honor a request for indemnity and that breach would then start the statute of limitations. But we note the superior court's concern with this approach — the indemnified party may "incur damages, sit on those damages for as long as [it wants], demand reimbursement of the damages, and then sue when [it is] refused."

Although we understand this concern, we find it to be misplaced in light of the Agreement's language and the parties' evident intent. First, the Agreement provides

---

**22** *Seaboard Coast Line R.R. v. Tenn. Corp.*, 421 F.2d 970, 975 (5th Cir. 1970) (holding that in a claim for indemnification stemming from a train collision, "the cause of action accrued only after a demand for indemnification had been made and this had been refused," although citing no authority for that proposition); *Oakview Treatment Ctrs. of Kan., Inc. v. Garrett*, 53 F. Supp. 2d 1196, 1202 (D. Kan. 1999) (holding that a claim did not accrue until the indemnitee informed the other party within a reasonable time of specific costs and expenses and sought performance and the defendant refused a particular payment that had come due).

**23** *Seybold*, 376 So. 2d at 1086.

**24** *Brannon v. Cont'l Cas. Co.*, 137 P.3d 280, 284 (Alaska 2006) (quoting *K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 725 (Alaska 2003)).

an incentive for the indemnified party to bring its claim for indemnity as soon as possible because waiting to pursue its indemnity action would not entitle it to any additional damages. Under Section 10.3(a), the parties agreed that

> a delay or defect in notifying the Indemnifying Party shall not relieve the Indemnifying Party of its obligations . . . except to the extent that (and only to the extent that) the Indemnifying Party demonstrates such failure shall have caused the Damages for which the Indemnifying Party is obligated to be greater than such Damages would have been had the Indemnified Party given the Indemnifying Party timely notice.

Based on the express language of the Agreement, Flint Hills would not benefit from waiting to seek indemnity if Williams demonstrated that the delay caused Flint Hills's damages to increase beyond what they would have been had it given Williams timely notice.

And second, "[w]hen interpreting a contract, our duty is to 'ascertain and give effect to the reasonable intentions of the contracting parties.' "[25] Flint Hills and Williams are two sophisticated parties and were represented by attorneys when they negotiated and drafted the Agreement.[26] The Agreement explicitly states that "a delay or defect in notifying the Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Agreement." Holding that Flint Hills's claims were barred by the statute of limitations would directly contradict the parties' clearly expressed intent.

---

[25] *Estate of Polushkin ex rel. Polushkin v. Maw*, 170 P.3d 162, 167 (Alaska 2007) (quoting *Western Pioneer, Inc. v. Harbor Enters., Inc.*, 818 P.2d 654, 656 (Alaska 1991)).

[26] *Cf. Renaissance Alaska, LLC v. Rutter & Wilbanks Corp.*, 263 P.3d 35, 41 (Alaska 2011) (finding parties' status as sophisticated actors weighed in favor of reading their agreement strictly).

We therefore hold, in the context of a pure claim for breach of a contractual term of indemnification, that the statute of limitations begins to run when the indemnifying party refuses the indemnified party's request for indemnification.[27] Because the claim is contractual in nature, it is subject to a three-year statute of limitations under AS 09.10.053. Accordingly, we reverse the superior court's finding regarding the statute of limitations' accrual date for the contractual indemnity claim.

## B. It Was Error To Conclude That Some Statutory Claims Were Time-Barred.

Flint Hills seeks to hold Williams strictly liable under AS 46.03.822(a) for damages both from sulfolane discharged on the refinery property during Williams's ownership and for the sulfolane that migrated onto nearby properties.[28] The superior court dismissed this claim as barred by the two-year limitation for statutory claims,[29]

---

[27] We note that, although a claim for indemnification may be made after an unreasonable period of time, we are not presented with this question in this appeal, and we therefore do not address it. Our holding also does not address the question of serial demands — whether the statute of limitations restarts each time a demand for payment is made — because Flint Hills's complaint requested the damages "that Flint Hills has incurred or will incur in the future in connection with the [c]ontamination."

[28] Alaska Statute 46.03.822(a) provides that "the owner and the operator of a . . . facility, from which there is a release . . . of a hazardous substance" are "strictly liable, jointly and severally, for damages, for the costs of response, containment, removal, or remedial action incurred by the state, a municipality, or a village." "The statute creates a private cause of action." *Maddox v. Hardy*, 187 P.3d 486, 491 n.7 (Alaska 2008) (citing *Fed. Deposit Ins. Corp. v. Laidlaw Transit, Inc.*, 21 P.3d 344, 356 (Alaska 2001)). "The statute applies when two elements are met. First, there must have been an 'unpermitted release of a hazardous substance' that caused damages. Second, the party being sued must own the hazardous substance at the time of the release." *Id.* at 491 (quoting AS 46.03.822(a)).

[29] Alaska Statute 09.10.070(a) provides in part: "Except as otherwise provided by law, a person may not bring an action . . . (5) upon a liability created by
(continued...)

holding that "the nature of the injury alleged arises from the [Agreement], not a trespass on land or even a trespass on the case, and therefore a two[-]year[] statute of limitations applies to Flint Hills'[s] strict liability claims." Flint Hills argues that the superior court erred in dismissing its strict liability statutory claim and maintains that the six-year limitations period for trespass is more appropriate than the two-year limitations period for statutory claims.[30]

We agree with the superior court that Flint Hills's strict liability statutory claim is time-barred by the two-year statute of limitations under AS 09.10.070(a) *with respect to sulfolane contamination on the refinery property*. But we hold that Flint Hills's potential liability to owners of properties *beyond the refinery's boundaries* is subject to the six-year statute of limitations for trespass claims under AS 09.10.050.

In determining the applicable statutes of limitations, we look to the language of the statutes. Alaska Statute 09.10.070(a) provides that a "liability created by statute" is timely if claimed within two years, and AS 09.10.050 provides that "[u]nless the action is commenced within six years, a person may not bring an action for waste or trespass upon real property." The six-year statute of limitations typically applies in tort trespass and nuisance cases.[31]

---

**[29]**(...continued)
statute, . . . unless the action is commenced within two years of the accrual of the cause of action."

**[30]**     Alaska Statute 09.10.050 provides: "Unless the action is commenced within six years, a person may not bring an action for waste or trespass upon real property."

**[31]**     *See Fernandes v. Portwine*, 56 P.3d 1, 5-6 (Alaska 2002) (holding that nuisance claims were encompassed by AS 09.10.050 due to the broad definition of trespass in the statute of limitations context as any "unlawful interference with one's person, property, or rights").

Flint Hills argues that the statute of limitations for this claim should be governed by *Federal Deposit Insurance Corp. v. Laidlaw Transit, Inc.*, where we accepted a certified question from the federal district court regarding private parties' rights to bring claims under AS 46.03.822(a) and whether timeliness could serve as a defense.[32]  In *Laidlaw* the FDIC acquired a parcel of contaminated property through receivership and brought a strict liability hazardous substance claim under AS 46.03.822(a).[33]  We held that the statute created a private right of action.[34]  We also noted:

> The defendants assert, without elaboration, that this case is governed by AS 09.10.070(a), which establishes a two-year limit for "an action . . . upon a liability created by statute." But it seems that this case might alternatively be governed by AS 09.10.050, which specifies a six-year limit for "an action for waste or trespass upon real property."[35]

But we declined to decide the issue because "the federal court's certification order only ask[ed] us to address FDIC's claim that no statute of limitations defense [was] available for a direct cause of action under AS 46.03.822(a)."[36]  Flint Hills suggests that our comment in *Laidlaw* "reflected [our] approach of looking to 'the nature of the injury

---

[32]     21 P.3d at 345-46.

[33]     *Id.*

[34]     *Id.*

[35]     *Id.* at 350 n.23.

[36]     *Id.*

alleged, rather than to the technical cause of action' in determining which limitations period applies to a given claim."[37]  In this regard Flint Hills is correct.

Looking to the nature of the injury alleged here, we observe that the claim Flint Hills asserted against Williams for contaminating the refinery property it purchased is not trespassory.  Williams had contaminated its own property.  Flint Hills then purchased the property and continued contaminating it.  There is nothing to suggest that the contamination by Williams, then by Flint Hills, was at any time trespassory.  The claim for contamination on refinery property is therefore subject to AS 09.10.070(a)'s two-year statute of limitations.  On the other hand, Flint Hills's claim asserted against Williams for contamination beyond the refinery property — on neighboring properties not owned by Flint Hills — is trespassory and therefore subject to a six-year statute of limitations under AS 09.10.050.[38]

Based on this distinction, we conclude that Flint Hills's AS 46.03.822(a) claim for contamination on its refinery property is barred by the applicable two-year statute of limitations.  A claim under AS 46.03.822(a) accrues where a party causes an unpermitted release of a hazardous substance that causes damage.[39]  Under the discovery rule, the statute of limitations will not begin to run until a reasonable person has enough information to be on notice for a potential cause of action or to inquire into the extent of the injury.[40]

---

[37]     *McDowell v. State*, 957 P.2d 965, 968 (Alaska 1998).

[38]     *See id.* ("[N]egligent contamination of real property is an injury to land in the nature of trespass.").

[39]     *Maddox v. Hardy*, 187 P.3d 486, 491 (Alaska 2008).

[40]     *John's Heating Serv. v. Lamb*, 129 P.3d 919, 923-24 (Alaska 2006); *Sopko v. Dowell Schlumberger, Inc.*, 21 P.3d 1265, 1272 (Alaska 2001) ("[U]nder the discovery
(continued...)

Flint Hills sued Williams on May 10, 2010. To be timely under the two-year statute of limitations, this claim must have accrued no earlier than May 10, 2008. The superior court made several findings regarding Flint Hills's knowledge of the sulfolane contamination on its property: (1) Flint Hills should have been on notice of the scope of the contamination since Shannon & Wilson's 2004 data review; (2) "Flint Hills actually incurred costs regarding Shannon & Wilson's work after [July 2004], specifically after the 20 July 2004 proposal"; (3) after Shannon & Wilson found sulfolane in a new well on the northern end of the property in September 2004, "Flint Hills should have drawn the conclusion that the sulfolane extended beyond the sampling disclosed as part of the [Agreement] and that it had the basis for an indemnification claim arising from the diminution of the refinery's value"; (4) the Department contacted Flint Hills in 2004, and that "[i]f it was not already apparent, the meeting and the letter should have put Flint Hills on notice that sulfolane was an issue and that further investigation was needed"; and (5) "[o]ver the course of the next two years, Shannon & Wilson repeatedly provided Flint Hills with information sufficient to inform it that the refinery had . . . sulfolane contamination and that it should conduct an investigation into the scope of that contamination."

The superior court found that Flint Hills reasonably should have concluded "long before May 10, 200[8]" that sulfolane had migrated beyond the sampling disclosed in the Agreement. We conclude these findings are not clearly erroneous, that Flint Hills had sufficient knowledge of contamination on its own property, and that it should have filed its strict liability statutory claim under AS 46.03.822(a) within two years of

[40](...continued)
rule it is irrelevant if the full scope of injury is not known immediately."); *Wettanen v. Cowper*, 749 P.2d 362, 365 (Alaska 1988) ("[C]ommencement of the statute [of limitations] will not be put off until one learns the full extent of his damages.")

receiving this knowledge.[41] Because this claim accrued well before May 10, 2008, it is barred by the two-year statute of limitations.

But as explained above Flint Hills's statutory claim for contamination on neighboring properties is subject to the six-year statute of limitations. Flint Hills's claim was timely because it was filed within the six-year period commencing in July 2004.

Flint Hills also seeks contribution from Williams under AS 46.03.822(j), which was amended in 2006 to allow a party to seek "contribution from any other person . . . liable under [AS 46.03.822(a)] during or after a civil action under [AS 46.03.822(a)] or after the issuance of a potential liability determination by the [D]epartment."[42] The superior court found that the Department's 2004 and 2006 letters qualified as "potential liability determinations" because they "gave clear notice of [the Department's] interest in the release of sulfolane, and both letters advised Flint Hills of the need to clean up the sulfolane." Because "potential liability determinations" preceded the amendment, the court concluded that passage of the amendment on April 27, 2006 triggered the statute of limitations.[43]

We conclude these findings are not clearly erroneous and the superior court's legal analysis is sound. Because we determined that Flint Hills's AS 46.03.822(a) claim for contamination on the refinery property is subject to a two-year statute of limitations, we conclude that Flint Hills's AS 46.04.822(j) claim is also subject

---

[41] *See Christianson v. Conrad-Houston Ins.*, 318 P.3d 390, 396-97 (Alaska 2014) ("Under the discovery rule, a cause of action accrues when the plaintiff has 'information sufficient to alert a reasonable person to the fact that he has a potential cause of action.' " (quoting *Preblich v. Zorea*, 996 P.2d 730, 734 (Alaska 2000))).

[42] Ch. 15, § 1, SLA 2006. This amendment provides that AS 46.03.822(j) "appl[ies] to liability for the release . . . of a hazardous substance that occurred . . . before the effective date of this Act." *Id*. § 3.

[43] *Id*. § 4.

to a two-year statute of limitations under AS 09.10.070(a).  We similarly conclude that Flint Hills's AS 46.03.822(j) contribution claim for contamination beyond the refinery property is subject to a six-year statute of limitations under AS 09.10.050.  Based on these conclusions and the statutory contribution right created by the 2006 amendment to AS 46.03.822(j), Flint Hills's May 10, 2010 claim for contribution for contamination off of the refinery property was timely filed within the six-year statute of limitations.[44]

To summarize, we hold that Flint Hills's contribution claim for damages beyond its premises is not time-barred, but its contribution claim for damages on its own property is barred by a two-year statute of limitations.

## C. The Superior Court Did Not Err In Dismissing Flint Hills's Equitable Claims.

In addition to its contractual indemnity and statutory claims, Flint Hills sought declaratory judgment and specific performance.  Flint Hills requested an order declaring its rights under the Agreement and its statutory rights, and it sought to compel Williams to perform the contract.

The superior court denied Flint Hills's equitable claims on two grounds. First, it held that equitable claims were not available because Flint Hills had an adequate legal remedy, notwithstanding that its legal claims were time-barred; "equitable relief is only available in the absence of an adequate legal remedy."[45]  Second, the court concluded that even if Flint Hills were entitled to assert equitable claims, the equitable

---

[44] Because Flint Hills's AS 46.03.822(a) claim for contamination on the refinery property is time-barred, we do not need to determine whether Flint Hills's AS 46.03.822(j) claim is timely because the claims that would have been subject to contribution are barred.

[45] *See Knaebel v. Heiner*, 663 P.2d 551, 553 (Alaska 1983) ("One who seeks the interposition of equity must generally show that he either has no remedy at law or that no legal remedy is adequate.").

doctrine of laches barred these claims because Flint Hills waited an unreasonable period of time and that "this delay prejudiced Williams." The court found "the memories of witnesses have faded, and as evidenced by their testimony at the hearing, they were unable in numerous instances to remember important information."

Flint Hills does not address on appeal the superior court's holding that its equitable claims are barred because it had an adequate remedy at law. But it argues that the superior court erred in applying the doctrine of laches because it did not unreasonably delay seeking relief; Flint Hills also argues that even if it did unreasonably delay in seeking relief, Williams suffered no prejudice.

We agree with the superior court that Flint Hills's equitable claims are coextensive with its legal claims and that Flint Hills therefore had (and given our reversal on the contractual indemnification and off-site statutory claims, still has) an adequate legal remedy. Flint Hills sought a judgment from the court declaring that Williams must indemnify Flint Hills under the Agreement and that Williams "is obligated to contribute to Flint Hills all [s]tatutory [d]amages that have resulted . . . from the [c]ontamination." Flint Hills also sought an order requiring Williams to perform under the terms of the Agreement.

These equitable remedies are identical to the legal remedies Flint Hills sought in its statutory and contractual claims. As discussed above, Flint Hills's legal claims sought to compel Williams to indemnify Flint Hills under the contract and to contribute to Flint Hills's damages under AS 46.03.822. Because Flint Hills's equitable claims seek identical relief, the superior court did not err when it dismissed Flint Hills's

equitable claims.[46]  And because equitable remedies are not available, we do not need to determine whether the superior court properly applied the doctrine of laches.

> **D.**    **The Superior Court Did Not Err In Holding That The Damages Cap Applied.**

The Agreement between the parties sets out a damages cap — the minimum and maximum amounts eligible for indemnification.  Flint Hills asks us to hold that the damages cap does not apply to the damages it seeks from Williams; it argues that at a minimum the Agreement's provisions are ambiguous and cannot be resolved as a matter of law.  Williams agrees with the superior court, which determined that the Agreement's damages cap unambiguously applies to the environmental claims for which Flint Hills seeks indemnity.

Section 10.4 of the Agreement sets out the damages cap:

> Notwithstanding anything to the contrary contained in this Agreement, and except with respect to claims for breaches of the covenants and obligations stated in Articles II, III, VI, or XI, the maximum amount of indemnifiable Damages which may be recovered by any Buyer . . . arising out of, resulting from or incident to the matters enumerated in Section 10.2(a) or Section 10.2(b) shall be the Environmental Cap with respect to any and all Environmental Claims and the General Cap with respect to any and all claims for indemnity other than Environmental Claims, but in no event shall the amount of all indemnifiable Damages of any type . . . pursuant to this Section 10.4(b) exceed the Aggregate Cap.

---

[46]    We conclude that Flint Hills's on-site contamination contractual indemnity and statutory contribution claims, though time-barred, remain adequate legal remedies for purposes of this analysis.  *McIntyre v. Plummer Assocs.*, 375 A.2d 1083, 1084 (Me. 1977) ("[A]n equitable remedy such as specific performance will not be granted . . . where an adequate legal remedy, once available, has been lost by the failure of the party seeking equitable relief to pursue that remedy in a timely manner."); *see also Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984) ("One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence.").

This Section references the "Disclosure Schedule," Schedule 10.2(a)(iv), which provides: "Buyer has agreed to assume full responsibility for all existing, known contamination at the Real Property specifically identified in the referenced figures, tables[,] and text described below." Flint Hills "acknowledge[d] that the levels of Hazardous Materials measured in monitoring wells and contained in the figures, tables[,] and text described below will vary over time, and that Buyer is responsible for such normal variations, as well as any changes in such contamination resulting from Buyer's actions or omissions after the Effective Time." The Schedule also states that data from the wells "can be used to support reasonable conclusions about present contaminant concentrations at the locations sampled and contaminant contours outside these locations." The Schedule lists reports prepared by Shannon & Wilson detailing sulfolane levels on the refinery property.

The superior court concluded that Flint Hills's claims for indemnification were subject to the damages cap. The court noted that the "crux of Flint Hills'[s] argument is that Section 2.3 encompasses environmental liabilities relating to the offsite sulfolane."[47] But the court observed that Section 10.4 — the damages cap

---

[47] Section 2.3(e) states: "Except as otherwise expressly stated in this Agreement, Seller shall retain, and shall pay and discharge, all Liabilities to the extent relating to or arising out of the use, ownership, or operation of the Assets prior to the Effective Time." Section 2.3 goes on to describe Williams's retained liabilities, including:

> (e) . . . any Liabilities arising from, relating to or incident to the possession, use, ownership, operation or existence of the Assets, . . . including all of the Liabilities associated with, resulting from or incident to:
>
> . . . .
>
> (xvii) Environmental Liabilities to the extent arising in,

(continued...)

section — "unambiguously states that any environmental claims for damages arising out of matters" in Section 10.2(a) — the indemnification section — are covered by the damages cap. The court noted Flint Hills's argument "that the *procedure* set forth in [Section 10.2(a)(iv)] applies but that the *result* set forth in Section 2.3 should govern." (Emphasis in original.) The court disagreed, explaining that "[t]he parties negotiated a procedure by which indemnification claims would be handled and the parties negotiated a maximum amount of indemnifiable damages." The court concluded that sulfolane fell under the framework set out in Section 10.2, the indemnification section, and that even if sulfolane could fall under Section 2.3, Flint Hills's argument would still fail because Section 2.3 "*defers* to other sections of the [Agreement]," excepting specifically "the [environmental] liabilities set forth in Section 10(a)(iv)." (Emphasis in original.)

"When interpreting a contract, [the court's] duty is to 'ascertain and give effect to the reasonable intentions of the contracting parties.' "[48] The court ascertains the parties' reasonable intentions by looking "to the language of the disputed provision and other provisions, relevant extrinsic evidence, and case law interpreting similar provisions."[49] "It is not necessary to find that an agreement is ambiguous before looking to extrinsic evidence as an aid in determining what it means."[50] "The rules in aid of

---

[47](...continued)
relating to or accruing in periods up to and including the Effective Time, other than the Environmental Liabilities set forth on Section 10.2(a)(iv) of the Disclosure Schedule.

[48] *Estate of Polushkin ex rel. Polushkin v. Maw*, 170 P.3d 162, 167 (Alaska 2007) (quoting *Western Pioneer, Inc. v. Harbor Enters., Inc.*, 818 P.2d 654, 656 (Alaska 1991)).

[49] *Western Pioneer, Inc.*, 818 P.2d at 656.

[50] *Estate of Polushkin*, 170 P.3d at 167.

contract interpretation are set out in section 202 of the Restatement (Second) of Contracts. The first and generally most important rule is that '[w]ords and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight.' "[51] "Moreover, interpretation of a contract term does not take place in a vacuum, but rather requires consideration of the provision and agreement as a whole."[52]

Flint Hills agrees that its claims are "Environmental Claims," but it argues that they are environmental claims that are not subject to the damages cap. Flint Hills argues that because the claims were brought as "retained liabilities" under Section 2.3, which does not mention a damages cap, these claims do not have a damages cap. It contends that this position does not conflict with Section 10's sweeping damages cap language because Section 10 excepts claims made under Section 2 and Flint Hills's claims are retained liabilities under Section 2. Alternatively, Flint Hills argues that the Agreement is ambiguous. Williams argues that the superior court was correct: sulfolane is an environmental condition that neatly falls within the Agreement's damages cap for environmental claims. Williams argues that even though Section 10 excepts claims arising under Section 2, Section 2 itself creates an exception for environmental claims, referring them back to Section 10 and to the damages cap.

The superior court did not err in its analysis. First, reading the Agreement as a whole convinces us that the parties bargained for all environmental liabilities to be subject to a damages cap. Section 10.4(b) unambiguously states that "the maximum amount of indemnifiable Damages which may be recovered . . . arising out of [claims for

[51]    *Id.* at 168 (alteration in original) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 202(1) (1981)).

[52]    *Mahan v. Mahan*, 347 P.3d 91, 95 (Alaska 2015).

indemnification brought under Section 10.2] shall be the Environmental Cap with respect to *any and all* Environmental Claims." (Emphasis added.) At oral argument Flint Hills was unable to cite an example of an environmental liability that would be subject to the damages cap but that would not also be considered a retained liability subject to Section 2.3. The damages cap would lose all effect if all environmental damages subject to the cap under Section 10.4 were also exempt from the cap under Section 2.3. It is clear to us that the parties intended contractual indemnification claims, such as those in this case, to be subject to the damages cap. Flint Hills is bound to the terms of the Agreement.

Second, from the structure and interplay of the two provisions, Williams is correct that environmental claims are "the exception to the exception" for Section 2. Even if Flint Hills's claims are retained liabilities under Section 2.3, the wording of that section expressly refers back to Section 10. Section 2 covers "Environmental Liabilities to the extent arising in, relating to or accruing in periods up to and including the Effective Time, *other than the Environmental Liabilities set forth on Section 10.2(a)(iv) of the Disclosure Schedule*." (Emphasis added.) Sulfolane on the property is covered by Section 10.2(a)(iv) of the Disclosure Schedule. And the environmental portion of Section 2 covers claims "[e]xcept as otherwise expressly stated in this Agreement," which refers back to Section 10's more detailed and specific language relating to environmental liabilities.

The superior court did not err when it concluded that the damages cap applies to Flint Hills's indemnity claims.

## IV.    CONCLUSION

We REVERSE the superior court's conclusions that Flint Hills's contractual indemnity clause claim and its statutory claim for off-site damages are time-barred. We AFFIRM the court's conclusion that the statute of limitations bars Flint

Hills's statutory claims for sulfolane contamination on its property, AFFIRM the court's dismissal of Flint Hills's equitable claims, and AFFIRM the court's conclusion that the damages cap applies to Flint Hills's indemnity claim. We REMAND for further proceedings consistent with this opinion.